THIRD DIVISION

May 5, 2004

No. 1-02-2642

THE PEOPLE OF THE STATE OF ILLINOIS

Plaintiff-Appellee,

v.

PIERRE JAMES 

Defendant-Appellant.

)

)

)

)

)

)

)

)

))

Appeal from the

Circuit Court of

Cook County

No. 99 CR 25318

Honorable

James M. Schreier,

Judge Presiding.

JUSTICE KARNEZIS delivered the opinion of the court:

Defendant Pierre James was tried in a joint jury trial with codefendant Willie Bishop and was convicted of first degree murder and sentenced to 40 years' imprisonment.
(footnote: 1)  On appeal, defendant contends: (1) the trial court erred in denying his request for a continuance to secure two alibi witnesses as well as an additional witness who would testify as to defendant's hairstyle at the time of the crime; (2) the trial court erred in denying his request for a severance and in permitting codefendant's tattoo to be introduced into evidence; (3) the trial court erred in admitting gang-related evidence; and, (4) Illinois Pattern Jury Instructions Criminal, No. 3.15 (4th ed. 2000) (hereinafter IPI Criminal 4
th
 No. 3.15) was erroneous.  We affirm.    

Defendant's conviction stems from a series of gang-related events in which the victim, Cory Boston, was shot and killed on June 26, 1998.  The relevant events that led to the victim's death began on the afternoon of May 4, 1998.  On that date, near the intersection of 111th Place and Aberdeen Street in Chicago, defendant exited a car driven by codefendant and began shooting at a group of men who were gathered outside a convenience store.  The group of men were members of the Black Disciples, which was a rival gang of the Gangster Disciples, of which defendant and codefendant were alleged to be members.  Defendant approached a car in which Robert Williams was sitting, pointed a gun at him and stated, "This is for my Folks, guy."  Defendant pulled the trigger but the gun did not fire.  Williams sped away and defendant ran back to codefendant's car.  About a block later, the two cars crashed into one another.  Codefendant fled the scene while defendant remained in the car partially unconscious.  A group of men who were Black Disciples converged on the car and beat defendant until police officers arrived.  Police officers recovered two guns near the car; however, the guns were never submitted for fingerprint analysis.  Defendant was identified by eyewitnesses Robert Williams, Tyrice Jones and Marvin Dixon, all of whom testified to the above at trial.  

Williams further testified he recognized defendant because he had seen defendant around the neighborhood about five or six times prior to that day.  Jones also testified he knew defendant from the neighborhood and identified defendant as a Gangster Disciple.  Jones was formerly a Gangster Disciple.  Dixon further testified he had known defendant for about eight years because defendant used to "hang around" the high school Dixon attended.  Dixon testified he is not a gang member.  

The victim's uncle,
 Steven Boston, testified that sometime prior to June 26, 1998, he was driving in his car when the vehicle in front of him stopped and defendant exited the vehicle.  Defendant approached his car and informed Boston that the victim had beat him while he was "down" or had "messed" up his face.  Defendant then told Boston that he was going to "come after" the victim and the others who had beaten him.  
 At about midnight on June 26, 1998, defendant, codefendant and a third, unknown individual returned to the same area near the intersection of 111th Place and Aberdeen Street.  At that time, Marvin Dixon and Pierre Martin were outside covering his girlfriend's car.  Tyrice Jones was sitting in a car parked across the street and the victim was sitting in his car, which was parked behind Jones' car.  Ed Calmes was standing on the front porch of his home.  Defendant, codefendant and the third individual approached the area on foot and fired shots at Dixon and Martin.  They then approached the victim's car.  One of the men approached the driver's side while the other two men approached the passenger side.  The men then fired into the victim's car, killing him.  Calmes, Jones and Dixon testified at trial, all identifying defendant and codefendant as two of the men who shot the victim.     

Calmes further testified that he recognized defendant because he had seen defendant around the neighborhood about a dozen times prior to that evening.  Calmes stated that defendant was the man who had approached the driver's side of the victim's car.  He also stated that defendant's hair was in braids, like "corn rows."  Calmes
 identified defendant in a lineup about two weeks later, but told officers defendant had changed his hairstyle.  Defendant's braids had been cut off and he had one long braid down the back of his head.  Calmes admitted to having several prior convictions.  

Jones further testified he heard Dixon yell, "oh shit, there go Pierre," and then heard gunshots.  He saw defendant at the driver's side of the victim's car.  Jones described defendant's hairstyle that night as a long ponytail.  Jones also admitted he had prior convictions.      

Dixon further testified he saw defendant run down the middle of the street with a gun in his hand.  Dixon yelled, "oh shit," and ran.  Despite Jones' testimony, Dixon stated he did not say, "there go Pierre."  
Dixon then saw defendant shooting into the victim's car.  Dixon also admitted he had prior convictions. 

Prior to defendant's trial, Dixon had been arrested and was in jail awaiting trial.  According to Dixon's testimony, when he was transported from the jail to the courthouse to testify at defendant's trial, he was placed in the same "bullpen" or lockup area as defendant and codefendant.  Defendant and codefendant approached Dixon and defendant expressed remorse for the shooting and blamed the shooting on his "youthful actions."  Defendant also told Dixon he could help Dixon with his case if Dixon did not testify at defendant's trial.  Defendant stated he could "hurt" the witnesses in Dixon's case.  Dixon understood that "hurt" meant to shoot the witnesses because defendant then made a shooting gesture like he was pulling a trigger.  Dixon informed the assistant State's Attorney what had happened in the lockup area and Dixon was placed in a segregated unit of the jail in the witness protection program.  Dixon admitted he received a credit on his account at the jail commissary for $35 a week as a result of being placed in the protection program.  Dixon stated, however, the assistant State's Attorney informed him they would not make any "deals" with him on his pending case in exchange for his testimony at defendant's trial.  

Detective Louis Caesar testified he interviewed defendant in July 1998, and defendant told the detective he did not remember his whereabouts the night the victim was killed.  

Assistant State's Attorney Stanislaus Gonsalves testified that he also interviewed defendant in July 1998, and defendant denied any involvement in the shooting and further said he had witnesses who would testify to his whereabouts that evening but could not provide their names or addresses. 

Investigator Thomas Ptak testified as the State's gang expert.  Ptak stated that defendant had numerous tattoos that he believed signified defendant was a Gangster Disciple.  Ptak also testified that codefendant had a tattoo of two semiautomatic pistols pointing upward with gunpowder coming out from both barrels and the words, "retaliation is a must." 

After Ptak's testimony, the court asked defense counsel how many witnesses she expected to testify.  Counsel advised the court she expected to call about four or five witnesses.  The court informed counsel that she could call the witnesses out of turn if necessary.  Prior to adjourning court for the day, the court advised the parties that the case would probably conclude the next day.  The court then informed the parties that it would reconvene court at 10:45 a.m. the next day so that the case could go to the jury "reasonably early."  

The next day, the State rested it's case and defendant moved for a directed verdict.  The trial court denied defendant's motion and defendant proceeded with his case in chief.   

Officer Pamela Guice testified that the night the victim was shot, she met with Dixon and Jones at the hospital.  Officer Guice acknowledged that Jones told Guice's partner that he saw "Willie P run up to the vehicle along with two unknown offenders firing several shots into the vehicle."  

The parties then entered into a stipulation that if Assistant States's Attorney Dan Reedy was called to testify, he would state that the first time he spoke with the victim's uncle, Steven Boston, was not until April 2000, more than a year and a half after the shooting.    

Defense counsel then called Pierre Martin to testify.  Martin testified that he was formerly a Gangster Disciple but was not a gang member on the night the victim was killed.  Martin also stated that when he heard gunshots, Dixon said neither, "oh shit" nor "it's Pierre."  

Defendant's cousin, Carrie Lowe, testified as to defendant's hairstyle throughout the summer of 1998.  Lowe stated that in May 1998, defendant wore his hair in individual braids, not "corn rows."  According to Lowe, defendant cut most of his braids, except for a few in the back, around the middle of May.  Defendant then cut all his braids except one.

Defense counsel asked the court for a sidebar, and a discussion was had off the record.  The court then advised the jury that they would be brought back out at 3:15 p.m.  At 3:15 p.m., court reconvened and defense counsel asked the court for a 10-minute continuance because there were three additional witnesses who had not arrived, but had been in court the previous day.  The trial court denied counsel's request and counsel rested her case, informing the court, "I have no choice but to rest." 

While the jury deliberated, defense counsel moved for a mistrial on the basis that the trial court's denial of counsel's request for a 10-minute continuance was erroneous.  Counsel argued that her witnesses had arrived in court about five minutes after counsel had rested and were late due to a traffic accident on the expressway.  The trial court denied counsel's motion, stating that the court had directed the witnesses to arrive at 10:45 a.m. that day.        

The jury found both defendant and codefendant guilty of first degree murder.  Subsequently, counsel filed a motion for a new trial, alleging numerous errors.  At the hearing on the motion, defense counsel made an offer of proof as to what the three witnesses would have stated had they been present to testify.  Tracey Poulos, the first alibi witness, would have testified that she lived in Riverdale, Illinois, and that on the afternoon and evening of June 26, 1998, defendant was at her home.  That afternoon and evening, defendant and several other individuals were in her basement watching movies.  She would further state that none of them left her home that evening and they were all there the next morning.  Defense counsel further stated that if Rena Williams, who is Poulos' daughter, had testified, she would have testified consistent with Poulos' testimony.  

As to the third witness, Charita James, defense counsel stated that James, who is defendant's sister, would have testified that she saw defendant shortly after the May 4, 1998, incident and defendant had cut his hair.  She would also state that in May, June, July, and August of 1998, defendant had short hair that was shaved close to his head, but had one skinny braid down the back of his head.  
Defense counsel further advised the court that none of the witnesses' statements had been memoralized in writing.    

The assistant State's Attorney responded that he and an investigator had spoken with Rena Williams, and Williams was unable to remember the specific date that defendant had stayed at their house.  Williams informed them that she was a student and had been on vacation from May 1998 until June 1998.  The assistant State's Attorney further informed the court that Williams had told him that Poulos would let defendant stay at their house whenever defendant was in trouble in his neighborhood because defendant could "hide out" there.  Williams also stated that defendant returned to their house the day the "boys had been shot up in the neighborhood and said that the police were looking for him."  Williams further told them that defendant was arrested about a week later, and it was just before his arrest that defendant cut his hair.

The assistant State's Attorney also stated that Tracey Poulos and Charita James refused to speak with them.  The State further pointed out that during the trial, the court had permitted counsel to call any witnesses out of order, which counsel could have done the day these witnesses had allegedly been in court.  The trial court denied defendant's motion for a new trial, and defendant now appeals.   

On appeal, defendant first contends the trial court abused its discretion in denying defense counsel's motion for a 10-minute continuance to secure the testimony of Tracey Poulos, Rena Williams and Charita James.  Defendant contends the witnesses' testimony was crucial because Poulos and Williams would have provided defendant with an alibi, and James would have testified as to defendant's hairstyle the night the victim was killed. 

Whether to grant or deny a motion for a continuance to secure the presence of a witness is within the sound discretion of the trial court, and its ruling will not be reversed on appeal in the absence of a clear abuse of discretion.  
People v. Ward
, 154 Ill. 2d 272, 307 (1992).  Upon review of the denial of a motion, the factors to be considered are: (1) whether the defendant was diligent in attempting to secure the witness for trial, (2) whether the defendant has shown the testimony was material and might have affected the jury's verdict, and (3) whether the defendant was prejudiced by the denial of the motion for a continuance.  
Ward
, 154 Ill. 2d at 307. 

Here, although defendant contends the witnesses' testimony is material to the case, we find that their testimony would not have changed the jury's verdict.  The proposed testimony of Rena Williams would have been completely contradicted by the statements she gave to the assistant State's Attorney.  That would have left Tracey Poulos as the sole alibi witness.  Even if Poulos had testified as alleged in the offer of proof, her testimony would have been viewed with great skepticism by the jury, who heard the testimony of Calmes, Jones and Dixon, the three eyewitnesses who identified defendant as one of the three men who shot the victim.  Each of the eyewitnesses testified he had known defendant from the neighborhood and their testimony was mainly consistent.  Also, Calmes and Jones specifically identified defendant as the individual who approached the driver's side of the victim's car.  Although the witnesses'  testimony differed slightly as to whether defendant had one long braid or numerous braids, this is insufficient to raise an issue of reasonable doubt.  Minor inconsistencies in testimony do not, by themselves, create a reasonable doubt.  
People v. Brisbon
, 106 Ill. 2d 342, 360 
(1985).  

Defendant relies on 
People v. Timms
, 59 Ill. App. 3d 129 (1978), and 
People v. Street
, 133 Ill. App. 2d 536 (1971).  In 
Timms
, the defendant was convicted of armed robbery based on the testimony of two eyewitnesses.  At trial, he presented an alibi defense and testified that, the day the robbery occurred, he was at his parents' home.  The testimony of the defendant's wife as well as his mother corroborated his testimony.  Late in the afternoon of the second day of trial, defense counsel learned that the defendant's father, who is a minister and mayor of his home town, as well as the defendant's brother, were unable to testify in court that day.  Defense counsel asked for a one-day continuance, which the trial court denied.  On appeal, this court found the trial court abused its discretion in denying the motion for a continuance because the testimony of the two additional alibi witnesses, which would have corroborated the defendant's testimony, was material and could have affected the outcome of the trial.  The court found that because the defendant's credibility as well as the credibility of his alibi witnesses was crucial to the case, the trial court should have granted the continuance.  
Timms
, 59 Ill. App. 3d at 136.  The court also noted, the fact that the defendant's father was a minister as well as mayor of a town might have caused the jury to place a "special degree of confidence" in his testimony.  
Timms
, 59 Ill. App. 3d at 137.  The court concluded that under these circumstances, had the witnesses been permitted to testify, the outcome of the trial might have been different.  
Timms
, 59 Ill. App. 3d at 137.

Here, unlike 
Timms
, the testimony of Tracey Poulos would not have affected the outcome of the trial.  As stated above, her proposed testimony would have been considered in combination with the strong eyewitness testimony.  Also, because the testimony of Rena Williams would have been contradictory and damaging, there would have been no other corroboration of Poulos' alibi testimony and the jury would have disregarded it.  

In 
Street
, the defendant was convicted of armed robbery based on the testimony of a single eyewitness who had not given police officers a description of the defendant, but had identified the defendant in a lineup.  The defendant presented an alibi defense at trial and testified that at the time of the robbery he was at home with his girlfriend having dinner.  The defendant further testified that he left his home later that evening to borrow a car to help his friend move.  On the second day of trial, before the court recessed the jury for lunch, the court informed those present, that it was possible they would adjourn early that day because of other matters before the court.  The court had adjourned the previous day at 2 p.m. to take care of other matters before the court.  When court resumed after lunch, defense counsel presented the testimony of the defendant's girlfriend, who corroborated his testimony.  Defense counsel then moved for a continuance to bring in at least one other witness the next day.  The trial court denied the motion and refused to allow defense counsel to make an offer of proof.  This court found on appeal that the trial court erred in denying the continuance because the time schedule enunciated by the trial court was so vague and because defense counsel was denied the opportunity to submit an offer of proof.  
Street
, 133 Ill. App. 2d at 541.  This court also found that although it could not speculate as to what the witnesses might have testified, the continuance should have been granted so that the defendant's "possible avenues of defense," including the testimony of the defendant's friend from whom he borrowed the car, could have been developed.  
Street
, 133 Ill. App. 2d at 541-42.  

We also find 
Street
 distinguishable.  Unlike in 
Street
, the trial court here was very clear that court would begin at 10:45 a.m. that morning.  The trial court was also very clear that court would reconvene at 3:15 p.m. that afternoon.  The trial court had also given defense counsel an opportunity to call the witnesses out of order the previous day.  Further, it is clear from the offer of proof that Poulos' testimony would not have changed the jury's verdict.  

We also find that Charita James' 
testimony would not have affected the outcome of the trial because it would have been cumulative to Carrie Lowe's testimony.  Lowe testified that in May 1998, defendant cut his braids off and only had one long braid.  Coincidently, Lowe's description is similar to Jones' description that on the night the victim was killed, defendant's hair was in a ponytail.  As stated above, although Calmes stated that defendant's hair was in "corn rows" at the time of the shooting, minor inconsistencies in testimony do not, by themselves, create a reasonable doubt. 
 
Brisbon
, 106 Ill. 2d at 360.
  Further, Calmes testified that when he identified defendant in a lineup, defendant had cut his hair, except for one long braid.  

Defendant next contends the trial court erred in denying his request for a severance because he was prejudiced by codefendant's "retaliation is a must" tattoo.
  Prior to trial, defense counsel made an oral motion to sever defendant's and codefendant's trials on the basis that defendant was prejudiced by codefendant's tattoo.  Defendant argued he was prejudiced because the tattoo was a "statement" that defendant was unable to confront and cross-examine codefendant about because codefendant would not testify at trial.  Specifically, defendant argued that such a situation violates the rule of law announced in 
Bruton v. United States
, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620
 (1968).  The trial court denied the motion, finding that the words contained in the tattoo were not a "statement
" that would implicate 
Bruton
.     

The general rule regarding severance is that jointly indicted defendants will be tried together (
People v. Strayhorn
, 35 Ill. 2d 41 (1965)), unless fairness to one of the defendants requires a separate trial to avoid prejudice.  
People v. Lee
, 87 Ill. 2d 182 (1981).  Illinois courts have recognized two independent sources of prejudice that necessitate separate trials.  
People v. Rodriguez
, 289 Ill. App. 3d 223, 235 (1997).  The first, upon which defendant's contention is based, involves an interference with the constitutionally guaranteed right of confrontation.  The other involves a situation in which the codefendants' defenses are so antagonistic to each other that one of the codefendants cannot receive a fair trial jointly with the others.  

In the first situation, a severance is necessary when one defendant has made out-of-court admissions that implicate a codefendant.  Where these statements are introduced into evidence, even with limiting instructions to the jury not to consider the statements against the codefendant, the codefendant's sixth amendment right of confrontation can be violated.  
Bruton v. United States
, 391 U.S. at 137, 20 L. Ed. 2d at 485 -86, 88 S. Ct. at 1628
.  In 
Bruton
, codefendant Evans orally confessed that he and Bruton committed the offense of armed postal robbery.  At their joint trial, Evans' confession was introduced into evidence.  The trial court instructed the jury that Evans' confession, which implicated Bruton in the crime, could only be considered as evidence against Evans and not Bruton.  On appeal, the United States Supreme Court held that "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining [Bruton's] guilt, admission of Evans' confession in this joint trial violated [Bruton's] right of cross-examination secured by the Confrontation Clause of the Sixth Amendment."  391 U.S. at 126, 20 L. Ed. 2d at 479
, 88 S. Ct. at 1622.  

In 
Lee v. Illinois
, 476 U.S. 530, 541, 90 L. Ed. 2d 514, 526, 106 S. Ct. 2056, 2062
 (1986), the United States Supreme Court further noted that "[o]ur cases recognize that this truthfinding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination."

The decision to grant or deny a severance rests within the sound discretion of the trial court and will not be reversed absent abuse.  
People v. Byron
, 116 Ill. 2d 81, 92 (1987).  

Applying the rule of law announced in 
Bruton
, we must consider whether codefendant's tattoo is an out-of-court confession or admission that implicated defendant in the crime charged.  Although the tattoo contains a "statement" 
per se
, we do not believe the tattoo could reasonably be construed as either a confession or an admission implicating defendant in the crime charged.  The constitutional violation that 
Bruton
 safeguards against is a nontestifying codefendant's out-of-court hearsay statement that implicates the defendant in the crime charged.  The 
Bruton
 Court observed that the credibility of the incriminating extrajudicial statements of a codefendant who stands accused "side-by-side" with the defendant are "inevitably suspect."  Bruton, 391 U.S. at 136, 20 L. Ed. 2d at 485, 88 S. Ct. at 1628
.  We simply cannot construe codefendant's tattoo as falling within the confines of this rule of law.

Although the specific question of whether a tattoo that contains a "statement" can trigger a 
Bruton
 violation has not been addressed by this court, this court's holding in 
People v. Davenport
, 301 Ill. App. 3d 143 (1998), 
is somewhat instructive.   In 
Davenport
, the State was permitted to identify the codefendant's numerous tattoos denoting his gang affiliation in the Black P-Stone Nation including the tattoos "B.P.S.," "B.S.," and the phrase "Stone life."  
Davenport
, 301 Ill. App. 3d at 149.  This court determined as a matter of first impression that a tattoo was not testimonial in nature and the defendant's sixth amendment right to confrontation was not violated where a nontestifying codefendant's gang tattoos were displayed to the jury.  
Davenport
, 301 Ill. App. 3d at 154, 
habeas corpus granted
, 
United States ex rel. Clemons v. Walls
, 202 F. Supp. 2d 767 (N.D. Ill. 2002), 
habeas corpus reversed by
 
Clemons v. McAdory
, 58 Fed. Appx. 657 (7th Cir. 2003).  
Davenport
 further noted that courts in California and Hawaii have essentially reached similar conclusions in holding that a person or his body may be used as an exhibit or demonstrative evidence, citing 
People v. Morgan
, 191 Cal. App. 3d 29, 236 Cal. Rptr. 186 (1987), and 
State v. Kaiama
, 81 Haw. 15, 911 P.2d 735 (1996).     

Defendant argues 
Davenport
 is factually distinguishable because codefendant's tattoo was not just an illustration; rather, it contained a statement implicating defendant, which constituted "written hearsay."  As stated above, we do not believe codefendant's tattoo can be construed as a confession or admission implicating defendant in the crime charged. 

Defendant also maintains that the jury should have received a limiting instruction advising them that the tattoo was only admissible as to codefendant and not defendant.  We note, however, that defense counsel never requested a limiting instruction.  Defendant's contention is waived.  Further, the court did instruct the jury before deliberations that evidence admitted as to codefendant could not be considered against defendant.  We find no error.  Defendant additionally maintains that the prosecutor's statements in closing arguments referencing codefendant's tattoo were also prejudicial.  Again, defense counsel failed to object and defendant's contention is waived.  We conclude the trial court did not abuse its discretion in denying defendant's motion for severance.  

Defendant further contends codefendant's tattoo was improperly admitted into evidence because it was not relevant to prove motive and was highly inflammatory with little or no probative value and prejudiced defendant.  

Although the State has no obligation to prove motive, the State may introduce evidence which tends to show that an accused had a motive for killing the deceased.  
People v. Smith
, 141 Ill. 2d 40, 56 (1990).  Any evidence which tends to show that an accused had a motive for killing the deceased is relevant because it renders more probable that the accused did kill the deceased.  
Smith
, 141 Ill. 2d at 56.  For such evidence to be considered competent, it must, "'at least to a slight degree, tend to establish the existence of the motive relied upon or alleged.'"  
People v. Easley
, 148 Ill. 2d 281, 326 (1992), quoting 
Smith
, 141 Ill.2d at 56.  

Here, codefendant's tattoo was admitted to establish that the motive for shooting the victim was retaliation for injuries defendant suffered at the hands of rival gang members.  Also, the additional evidence presented at trial established that defendant had threatened to "come after" those who he believed had beat him.  Further, the State proceeded on an accountability theory, meaning that defendant and codefendant were responsible for each other's actions regardless of whose bullets actually struck the victim.  
We find the admission of codefendant's tattoo relevant and proper.     

Defendant next contends the trial court erred in admitting gang-related evidence.  He maintains that because the shooting could have been explained without the introduction of gang evidence, it was error to admit any evidence of gang activity.    

Evidence that the defendant was a member of a gang or participated in gang-related activities may be admissible at trial, despite its prejudicial effect, to establish a common purpose or design or to provide a motive for an otherwise inexplicable act.  
People v. Patterson
, 154 Ill. 2d 414, 458 (1992).  However, the evidence's prejudicial effect must not substantially outweigh its probative value.  
People v. Fluker
, 318 Ill. App. 3d 193, 204 (2000).  The trial court's ruling is not to be overturned on appeal unless a clear abuse of discretion is shown.  
People v. Hamilton
, 328 Ill. App. 3d 195, 202 (2002).  

Here, the trial court allowed evidence of gang-related activities to be introduced into evidence because it found the victim's death was "inextricably part and parcel of the beating."  We agree.  The gang evidence was relevant to explain the entire sequence of events beginning with the May 4, 1998, incident in which defendant shot at rival gang members, who then in turn beat him when his car crashed.  The events then culminated in the victim's death on June 26, 1998, when defendant and codefendant returned to the same area to seek revenge on the same rival gang members.  The gang evidence was necessary to explain what would otherwise be an inexplicable shooting.  We are unable to find that the trial court abused its discretion under these circumstances.  

Lastly, defendant contends the trial court misstated the law when it issued IPI Criminal 4
th
 No. 3.15 to the jury regarding eyewitness testimony.  Defendant acknowledges he failed to object to the instruction at trial, but urges this court to consider his contention under plain error.

Although defendant raised the issue in a posttrial motion, in order to preserve an issue for review, defendant must both object at trial and raise the issue in a posttrial motion.  
People v. Enoch
, 122 Ill. 2d 176, 186 (1988). Even if we were to address defendant's contention, we find any error harmless.

IPI Criminal 4
th
 No. 3.15
, as tendered to the jury, read: 

"When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including but not limited to, the following:

The opportunity the witness had to view the offender at the time of the offense.

or

The witness's degree of attention at the time of the offense.

or

The witness's earlier description of the offender.

or 

The level of certainty shown by the witness when confronting the defendant.

or

The length of time between the offense and the identification confrontation." 

Specifically, defendant argues that by using the connector "or" between each of the factors, the court incorrectly informed the jury that they could consider any one of the five factors, rather than all of them.  Defendant relies on 
People v. Gonzalez
, 326 Ill. App. 3d 629 (2001).  In 
Gonzalez
, the trial court gave an instruction identical to the instruction in the case at bar.  The defendant argued on appeal that he did not receive a fair trial because the instruction as given misstated the law.  This court agreed with the defendant that the instruction was erroneous, but further considered whether the error was harmless.  The court concluded that, because the evidence was closely balanced and because the prosecutor emphasized the erroneous instruction in closing arguments, the error was not harmless and a new trial was proper.  
Gonzalez
, 326 Ill. App. 3d at 635. 

We find 
Gonzalez
 distinguishable.  Here, as stated previously, the evidence was not closely balanced.  Further, the prosecutor never mentioned the instruction in closing arguments.   We find any error harmless.  See also 
People v. Furdge
, 332 Ill. App. 3d 1019 (2002); 
People v. Mercado
, 333 Ill. App. 3d 994 (2002); 
People v. Brookins
, 333 Ill. App. 3d 1076 (2002); 
People v. Smith
, 341 Ill. App. 3d 530 (2003); and, 
People v. Carrero
, 345 Ill. App. 3d 1 (2003) (all finding that the erroneous instruction was harmless because the evidence was not closely balanced and the outcome of the case would not have been different had the jury been instructed properly).  See also 
People v. Tisley
, 341 Ill. App. 3d 741 (2003) (finding that the use of "or" in the instruction was not error).     

Accordingly, we affirm the judgment of the trial court.

Affirmed.

HOFFMAN, P.J. and SOUTH, J., concur.

FOOTNOTES
1: Willie Bishop is not a party to this appeal.