THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM CARINI, Defendant-Appellant.

First District (5th Division)   No. 1—02—3574

Opinion filed April 15, 2005.—Rehearing denied May 11, 2005.

Michael J. Pelletier and Daniel J. Walsh, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and Yvette Loizon, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GALLAGHER delivered the opinion of the court:
Following a jury trial, defendant William Carini was convicted in

1985 of concealing the homicidal deaths of John Kuba and Joanne Seaquist. After serving prison time for those offenses, defendant was tried in 2002 for the first degree murder of Kuba and Seaquist. Following a bench trial, defendant was convicted and sentenced to natural life in prison. On appeal, defendant now contends that the trial court erred in: (1) denying his motion to dismiss the indictment based on unreasonable preindictment delay; (2) denying his counsel's request for a continuance to present the testimony of a witness who would testify regarding defendant's relationship with Ed Kuba, who is defendant's uncle and was John Kuba's brother; and (3) failing to address his posttrial *pro se* complaints of ineffective assistance of trial counsel. For the reasons that follow, we affirm defendant's convictions for first degree murder.

## BACKGROUND

While the facts surrounding the deaths of John Kuba (hereinafter referred to as Kuba) and Joanne Seaquist are largely detailed in *People v. Carini*, 151 Ill. App. 3d 264, 502 N.E.2d 1206 (1986), certain testimony described in that opinion is pertinent to defendant's contentions in this appeal.[1] On September 3, 1983, the bodies of Kuba and Seaquist, a friend of defendant, were found in the trunk of Kuba's white 1968 Chevrolet, which was housed in a self-storage facility in Northbrook. Defendant had rented the storage space on April 5, 1983.

In the months before Kuba's death, defendant and Kuba, who was defendant's uncle, lived in a Glenview house that had belonged to Kuba's parents (defendant's grandparents). Defendant testified that on the night of April 2, 1983, he and Seaquist were at the house, and Kuba came home. Defendant went to sleep in the basement, leaving Kuba and Seaquist in the kitchen. Defendant testified that he later was awakened by gunshots and loud voices, including Kuba's.

---

[1]The State asserts that the three-volume report of proceedings and common law record of defendant's first trial ("the 1985 record") should not have been included in the record on appeal because it was not entered into evidence in defendant's 2002 bench trial. We agree that this court can consider the contents of the 1985 record only if it was properly made part of the trial record. See *People v. Heaton*, 266 Ill. App. 3d 469, 476, 640 N.E.2d 630, 635 (1994) (reviewing court must determine issues before it on appeal solely based on record made in trial court).

Defendant responds that the trial court considered a portion of the 1985 record before hearing defendant's testimony in this case. Indeed, the record of the instant proceedings indicates that defendant's 1985 testimony was admitted by stipulation and that the State impeached defendant with portions of that testimony.

Defendant stated that he hid in a crawlspace for about an hour before going upstairs to find Kuba and Seaquist missing.

To counter the State's charge that he concealed Kuba and Seaquist's homicidal deaths, defendant raised the affirmative defense of compulsion, testifying that while he searched the house for signs of Kuba and Seaquist on April 3, an anonymous telephone caller directed him to "get rid of the Chevy." That call was followed by two additional calls ordering defendant to dispose of the car. Defendant received a fourth phone call on April 4, and he brought the Chevrolet to the self-storage facility the next day.

Defendant was convicted of two counts of concealment of homicidal death. On appeal, this court affirmed defendant's convictions but modified his consecutive five-year terms, holding that the two five-year sentences should be served concurrently. *Carini*, 151 Ill. App. 3d at 287, 502 N.E.2d at 1220. Defendant was released from prison in August 1987.

### DEFENDANT'S TRIAL FOR THE MURDERS OF KUBA AND SEAQUIST

#### 1. The State's Evidence

At defendant's 2002 trial, the State presented the following relevant evidence. Seaquist's sister, Jennifer Brenner, testified that at about 11 p.m. on April 2, 1983, Seaquist called home at the end of her shift at her waitressing job to tell Brenner that defendant was picking her up from work. When Seaquist did not return home the following morning, Brenner called defendant, who said he had dropped Seaquist off at a bar at 5 a.m. On cross-examination, Brenner stated that although her sister and defendant were not friends, Seaquist did not dislike defendant, and they often spent time with other people at a local park. Brenner did not know if Seaquist had known Kuba.

The parties stipulated to the entry of the testimony of Seaquist's mother from defendant's previous trial. Seaquist's mother, who was also named Joanne, corroborated Brenner's testimony regarding her daughter's phone call from work on April 2. Seaquist testified that her daughter and defendant had known each other since childhood and that their families once lived in the same neighborhood. Seaquist stated that her daughter and defendant were friends but had not dated.

Jon Johnson testified that he was a friend of Seaquist and defendant. On the night of April 2, Johnson and defendant were playing pool at defendant's house. Johnson testified that because he was afraid of Kuba, he asked defendant if Kuba was home, and defendant replied that Kuba had been missing for a couple of weeks. Johnson

testified that Seaquist called and asked defendant to pick her up. Defendant, Johnson and Seaquist arrived back at defendant's house at 3 or 4 a.m. on April 3. Johnson testified that he left the house at about 5 a.m.

Johnson testified that on April 4 or 5, he was questioned by local police, and defendant called him to ask what he had said. Johnson asked defendant if he and Seaquist were romantically or sexually involved, and defendant responded that he was interested in Seaquist but that she did not feel the same way. According to Johnson, defendant also remarked about a part of Seaquist's female anatomy.

David Pinter testified that in 1983, he was defendant's supervisor at United Parcel Service (UPS). As he had testified at defendant's earlier trial, Pinter stated that on March 31, defendant did not come to work and did not call to explain his absence. The next day, defendant came to work and told Pinter he was absent the previous day because his uncle was found dead and he had been making arrangements.

Kathleen Kuba testified that she and Kuba married in 1978 and were involved in divorce proceedings in 1982 and 1983. Kathleen stated that she and Kuba were scheduled to appear in court regarding their divorce on April 4, 1983, which was a Monday. Kathleen testified that on March 26, defendant called her and told her not to "bother going to court Monday. Uncle John is never going to show. They'll never find him."

Gary Campbell testified that he and Kuba were acquainted through their mutual interest in race cars and that he also had met defendant. On or around April 8, 1983, defendant contacted Campbell about selling car parts that belonged to Kuba. When Campbell questioned defendant about his offer because he knew that Kuba was very protective of his cars, defendant replied, "F--- it. Don't worry about it. John's dead."

Katherine Owens testified that she was a high school friend of Seaquist and that she and another friend, Teri Budzik, went to defendant's house on the afternoon of April 4 to ask him about Seaquist's disappearance. Owens also stated although she did not mention Kuba, defendant told them that Kuba had been missing for a week and that he had reported Kuba missing to police.

Philip Bettiker testified that as a Cook County sheriff's detective, he was at the Glenview home on April 19, 1983. Bettiker stated that Ed Kuba consented to a search of the home. Bettiker asked defendant about his missing uncle, and defendant replied that he had not seen Kuba since March 26, when he had been in his basement bedroom and heard Kuba in the kitchen with several people.

Bettiker's testimony was consistent with that offered at defen-

dant's earlier trial. In addition, Bettiker testified that during the interrogation of defendant on September 4 in an Iowa jail, defendant called Kuba a "jagoff" and said that Kuba belittled him and that they would argue and fight. Defendant told Bettiker that Kuba dealt in cocaine and owed money to many people and that the Chicago Outlaws may have been responsible for Kuba's death.

Deborah Prusinski, who had a child with defendant in 1989, testified that while she and defendant were living together in the summer of 1988, she asked defendant about Seaquist. Defendant told her that he had killed Kuba because Kuba "deserved to die." Defendant denied killing Seaquist, saying he had been in love with her. Prusinski testified that defendant did not tell her that a struggle had taken place or that Kuba had killed Seaquist. Prusinski said that these conversations took place shortly after she and defendant had ingested heroin and cocaine. Prusinski was imprisoned from 1992 to 1996 for burglary, and in 1995, she contacted the office of the Lake County State's Attorney regarding defendant's comments about Seaquist and Kuba.

Ed Kuba testified, as he did at defendant's earlier trial, that he last spoke to his brother on March 24, and they arranged to meet at the house on the morning of March 26 to look at a car Kuba bought. When Ed and his wife entered the house on March 26, defendant told them that Kuba had left at about 2 a.m. with two men. Ed, his wife and defendant went into the garage, and Ed noted that the engine of one of his brother's cars was warm. Defendant told Ed he had taken the car for a drive. Ed testified that was unusual because Kuba "never let anybody drive his cars." On March 28 or 29, defendant told Ed he was selling Kuba's car parts because Kuba owed him money.

At about 8:30 a.m. on April 3, Ed and his wife returned to the house, and defendant told them he had not heard from Kuba. The following week, Ed returned to the home and discovered bloodstains on a set of stairs in the garage. Ed scraped up some of the stain onto a piece of paper and gave the sample to police.

On cross-examination, Ed stated that he had operated a commercial carpet installation and cleaning company since 1983. From 1968 to 1974, he ran a carpet cleaning business and defendant worked for him at some point in the 1970s. Ed stated that during April and May 1983, he called defendant to see if he had seen or heard from Kuba. In April, after Ed returned from a meeting with Vernon Hills police officers, he received a message on his answering machine from a caller who stated, "Get your headstones. You're next." Ed recognized the voice as defendant's. Ed testified that he knew Julius Echeles, who had represented defendant at his earlier trial.

Larry Laschen testified that in 1983, he was the Vernon Hills

police chief and was involved in investigating the deaths of Kuba and Seaquist. Laschen stated that within two months after Kuba disappeared, Ed told Laschen that he was afraid of defendant. Laschen's testimony was admitted to refute a charge that Ed's testimony was of recent fabrication.

The State offered medical testimony that Seaquist died of strangulation and that Kuba was shot a total of seven times in the chest, neck and abdomen.

## 2. The Defense

John Apel testified that he is a Chicago police officer and a cousin of the Kuba brothers. Apel stated that one or two weeks before he learned that Kuba was missing, Kuba told him that he owed a lot of money to a drug dealer. Apel arranged for Kuba to meet with four or five narcotics officers. On cross-examination, Apel stated that Ed had served as a confidential informant to police and against him (Apel) and that he was upset with Ed about that.

Defendant testified that he moved into his grandparents' home when he was 12 years old and that both of his uncles also lived there at various times. Kuba was about five years older than defendant, and Ed was about 13 years older than defendant. Defendant said he worked for Ed's carpet cleaning company between 1978 and 1980.

Defendant said he and Seaquist were "good friends" but were never romantically involved. He stated that at about 8 a.m. on March 14, 1983, Kuba brought Seaquist home after the two had been at a bar together, and the two of them snorted cocaine and Kuba unsuccessfully tried to persuade Seaquist to try on some lingerie. Defendant said he drove Seaquist home that afternoon.

Consistent with the testimony of Detective Bettiker, defendant testified that on March 26, he heard Kuba in the kitchen with several people. However, defendant's account of April 2 and 3 differed from his testimony at his earlier trial. Defendant testified that after he, Johnson and Seaquist returned home from their evening out, Johnson left and Kuba came home. Defendant said that Kuba asked defendant about Seaquist and the lingerie, and defendant told Kuba not to "play that game." Defendant testified that Kuba asked him to go downstairs and put on a record album. Defendant went in the basement and remained there, listening to the entire album. After the album ended, defendant heard a scream upstairs. Defendant went upstairs and found Kuba attacking Seaquist in the master bedroom. Defendant said Kuba had a tie around Seaquist's throat and was shaking her. Defendant stated that he intervened to stop Kuba and while he and Kuba struggled, he took a gun away from Kuba and fired several times.

After shooting Kuba, defendant checked on Seaquist and found that she was dead. Defendant testified that Kuba killed Seaquist and that he killed Kuba in self-defense and in defense of Seaquist. Defendant said that he ran to the phone but did not call anyone and that he "passed out."

Defendant testified that Ed advised him to conceal the deaths. Defendant testified that on April 3, he woke up when Ed entered the house alone. Defendant pointed toward the bedroom and told Ed that it "wasn't [defendant's] fault." According to defendant, Ed said they would have to "get rid of" the bodies. Defendant stated that he backed the white Chevrolet into the garage, Ed brought Seaquist's body downstairs, and they carried Kuba downstairs together. Defendant testified that he and Ed cleaned up bloodstains, and Ed removed Seaquist's purse and other possessions from the home. Defendant testified that Ed ordered him to take the car to a facility that crushes automobiles but that defendant did not do that because he did not want Seaquist's body to be crushed.

Defendant stated that when Seaquist's mother called, he told her that he had dropped Seaquist off at a bar. Defendant said that Ed told him to say that; however, defendant could not recall when Ed had given that direction. Defendant admitted that he lied to police and to Seaquist's family. When asked if he testified truthfully at his previous trial, defendant replied that he "didn't tell all the truth." Defendant testified that when he told Ed on April 4 that he did not have the car crushed, Ed cursed at him and said he already had reported his brother missing.

Defendant testified that he did not go to work at UPS on March 31 because Ed had called earlier that day and asked for his help in burglarizing a home; however, defendant said Ed never called again in furtherance of that plan. Defendant denied telling Pinter that his uncle had been found dead and that he had been busy making funeral arrangements, instead stating that he told Pinter he was concerned that he had not heard from either of his uncles the previous night and that if Kuba "turn[ed] up dead," defendant would have to "make arrangements to attend another damned funeral."

Regarding his first trial, defendant testified that he and Ed "put [his] defense together," along with Echeles, although defendant stated that his uncle was not present when he first met with Echeles. Defendant testified that at his earlier trial, he was "taking signals" from Ed and answered "yes" or "no" based on Ed's eye movements. Defendant said he and his cousin, Dennis Liberti, worked for Ed's company in the early 1990s as carpet installers.

## 3. The State's Rebuttal Evidence and the Defense's Surrebuttal

In rebuttal, the State called Bruce Paynter, one of the prosecutors at defendant's earlier trial, who testified that Ed was the first witness at that trial and that after his testimony, Ed was not present in the courtroom for the rest of the trial.

Ed testified that he did not see the bodies of his brother or Seaquist at the house on April 3 and did not plan with defendant to conceal the deaths. Ed stated that although defendant worked for his carpet company during the 1970s, defendant did not work for him in the early 1990s, as Liberti had. In surrebuttal, defendant testified that when he worked for Ed's company in 1991, he initially was paid by Liberti but he eventually received a check signed by Ed.

## 4. The Trial Court's Ruling

The trial court found defendant guilty of the first degree murder of Kuba and Seaquist, stating, *inter alia*, that the "credible evidence" led to the conclusion that Kuba died on March 25 or 26. The court based its conclusion on Kathleen Kuba's testimony that defendant told her on March 26 that "they'll never find [Kuba]"; the testimony of Pinter, defendant's boss at UPS, that defendant told him on April 1 that his uncle was dead; and on Detective Bettiker's testimony that defendant told him on April 19 that he had not seen Kuba since March 26. The court also noted Johnson's testimony that Kuba was not at the house on April 2 and that defendant told Johnson that Kuba had been missing for a couple of weeks. From that testimony and other accounts, the court concluded that Kuba was killed on or about March 26 and therefore was not present on the night Seaquist was killed. The trial court noted that the only evidence that Ed was involved in a plot to conceal the deaths had been offered by defendant.

## ANALYSIS

### 1. Defendant's Motion to Dismiss Indictment Based on Unreasonable Delay

On appeal, defendant first contends that the trial court erred in denying his motion to dismiss the indictment based on the 3½-year delay between the State's knowledge of defendant's inculpatory statement to Prusinski in February 1996 and the issuance of first degree murder charges against him in 1999. Defendant asserts that this delay prejudiced his case because he was unable to offer the testimony of: (1) Ed Larsen,[2] who operated a gas station in Glenview and stated

---

[2]Although the spelling "Larson" was used in defendant's original motion and continues to be used by the State, defendant now refers to the potential witness as "Ed Larsen, Sr." We adopt defendant's spelling of "Larsen."

that he saw Kuba on April 2, 1983; and (2) Echeles, defendant's attorney at his first trial, who would have testified as to defendant's relationship with Ed. Defendant contends that because he was unable to present the testimony of those witnesses, he is entitled to an outright reversal of his conviction.

Defendant was indicted in June 1999. On February 16, 2000, defendant moved for dismissal of the indictment, asserting that due to the 3½-year period between Prusinski's statement to police and the indictment, he was unable to present the testimony of four deceased witnesses, including Larsen and Echeles, who "individually and collectively had information concerning Kuba's drug dealing activities and prior incidents in which Kuba's life had been threatened by other drug dealers as a result of these activities."

The motion stated that Larsen would have testified that Kuba was alive on April 2, 1983, and that such testimony conflicted with the State's theory that Kuba died several days before Seaquist. As to Echeles, defendant's motion stated that Echeles had represented Kuba on drug charges and that Kuba, at the time of his death, had "entered into negotiations *** to become a government informant against other drug dealers" and that Echeles was aware of that. The trial court denied defendant's motion, finding that it raised "a mere assertion of speculative harm about the lack of the testimony of dead witnesses."

■ The due process clause protects an accused party from oppressive and unreasonable preindictment delays. *United States v. Marion*, 404 U.S. 307, 325-26, 30 L. Ed. 2d 468, 481-82, 92 S. Ct. 455, 466 (1971). In *People v. Lawson*, 67 Ill. 2d 449, 459, 367 N.E.2d 1244, 1248 (1977), the Illinois Supreme Court enunciated the test to be applied:

> "Where there has been a delay between an alleged crime and indictment or arrest or accusation, the defendant must come forward with a clear showing of actual and substantial prejudice. *** If the accused satisfies the trial court that he or she has been substantially prejudiced by the delay, then the burden shifts to the State to show the reasonableness, if not the necessity, of the delay." (Emphasis omitted.)

If that analysis reveals both substantial prejudice and the reasonableness of the delay, the court balances the interests of the defendant and of the public in determining whether to dismiss the charge against the defendant, considering the length of the delay and the seriousness of the crime. *Lawson*, 67 Ill. 2d at 459, 367 N.E.2d at 1248.

■ Initially, we note that defendant asks this court to review the trial court's ruling on his motion to dismiss the indictment under a *de novo* standard because it involves a question of law. Although the

State does not enunciate a standard of review in its brief, we agree with defendant that *de novo* review is necessary on this issue. As noted in *Lawson*, "[d]ue process is a fundamental premise of our system of justice and is constitutionally guaranteed by the fourteenth amendment." *Lawson*, 67 Ill. 2d at 456, 367 N.E.2d at 1247. The standard of review for determining whether an individual's constitutional rights were violated is *de novo*. *People v. Burns*, 209 Ill. 2d 551, 560, 809 N.E.2d 107, 114 (2004).

### a. *Testimony of Ed Larsen*

■ Defendant argues that he was substantially prejudiced by the loss of Larsen's testimony, pointing out that Larsen died 3½ years after the State interviewed Prusinski, defendant's former girlfriend, and three days after defendant was indicted. At trial, defendant presented the theory that Kuba and Seaquist both died in the early morning hours of April 3, 1983, with Kuba strangling Seaquist and defendant shooting Kuba in self-defense. Defendant claims that Larsen's testimony that he saw Kuba on April 2 would have supported his theory and contradicted the State's premise that Kuba and Seaquist died approximately a week apart, with defendant killing Kuba on March 25 or 26 and Seaquist on April 3. Defendant also asserts that Larsen's testimony would have mitigated the effect of defendant's admissions that Kuba disappeared on or around March 26.

Defendant argues that Larsen's testimony "would have completely refuted the prosecution's theory of the case." The State responds that whether defendant was substantially prejudiced by the absence of Larsen's testimony depended on the credibility of defendant's version of events as opposed to the State's evidence.[3]

Considering Larsen's proposed testimony, we cannot conclude that his single account would have counterbalanced the considerable weight of the State's evidence, such that defendant was prejudiced by its loss. To review the State's case, Johnson testified that defendant told him on April 2 that Kuba had been missing for about two weeks. Seaquist's high school friend, Katherine Owens, said defendant told her on April 4 that Kuba had been missing for about a week. Pinter, defendant's boss at UPS, testified that on April 1, defendant said he had not come to work the previous day because his uncle had been found dead. Detective Bettiker testified that defendant told him on April 19 that he had not seen Kuba since March 26. Ed also offered

---

[3]The State also notes tangentially that although defendant asserts he was prejudiced by the delay between Prusinski's statement and the indictment, defendant does not object to the 16-year span between the crimes and the indictment.

testimony that would support the State's theory that his brother was killed on or about March 26, stating that defendant admitted to selling his uncle's car parts on March 28 or 29. In addition, Kuba's former wife, Kathleen, testified that defendant told her on March 26 that Kuba would not be in court the following week and that "they'll never find him."

Any testimony by Larsen that he saw Kuba on the night of April 2 would not, as defendant suggests, have "completely refuted" the State's case. Given the voluminous evidence as to the timing of Kuba's death on or about March 26, defendant has not shown that he was actually and substantially prejudiced by the absence of Larsen's testimony. Because defendant has not met that burden, we need not proceed to consider the reasonableness of the State's delay in indicting defendant. See *Lawson*, 67 Ill. 2d at 459, 367 N.E.2d at 1248.

### b. *Testimony of Julius Echeles*

Defendant also asserts that Echeles, his attorney at his first trial, would have testified as to defendant's relationship with Ed in 1983 and would "shed light on why [defendant's] 1985 testimony was falsely given and why his self-defense testimony in 2002 was credible." Pointing to the differences between his own testimony and Ed's, defendant contends that it is "not wholly unbelievable" that, after killing both victims, he acted at Ed's direction and hid the bodies to escape prosecution.

As the State points out, defendant's contentions on appeal as to Echeles are different from those contained in his motion to dismiss the indictment. Specifically, defendant stated in his motion that Echeles would have testified that Kuba was a drug dealer who was about to cooperate with the government in pursuing other drug dealers, thus positing a theory that Kuba died at the hands of someone other than defendant. In contrast, defendant now asserts Echeles would testify that Ed controlled defendant's testimony at his 1985 concealment trial, leading him to offer false testimony, and that defendant told the truth at his murder trial.

The State contends, and defendant does not dispute, that those assertions were waived by defendant's failure to include them in his motion to dismiss the indictment. However, even if defendant had properly preserved his claims that Echeles would testify that Ed directed defendant's testimony at his first trial, we would not conclude that defendant was actually and substantially prejudiced by the loss of Echeles' testimony.

The theory presented by Echeles' suggested testimony—that Ed masterminded the slaying of his brother—was belied by the State's

evidence. Ed consented to a search of the Glenview home, provided police with samples of bloodstains taken from the garage and reported his brother missing on April 4. Moreover, despite defendant's contention that Echeles' testimony was necessary to "establish the nature of [defendant's] relationship with Ed," defendant's own testimony provided the very facts that defendant suggests Echeles would have provided. Defendant testified that Ed told him to conceal the deaths, that they moved the bodies together and that Ed ordered him to dispose of the car. Defendant also testified that he, Ed and Echeles formulated his defense at his first trial. Ed testified that he knew Echeles. Therefore, Echeles' suggested testimony would not have offered any new information, and it only would have duplicated defendant's testimony. The absence of Echeles' testimony did not actually and substantially prejudice defendant. Again, because defendant has not met that burden, we need not consider the reasonableness of the State's delay in indicting defendant. See *Lawson*, 67 Ill. 2d at 459, 367 N.E.2d at 1248.

### 2. The Trial Court's Ruling on the Testimony of Dennis Liberti

■ Defendant's next contention on appeal is that he was denied his constitutional right to present a defense when he was prevented from offering Liberti's testimony. Defendant asserts that Liberti would have impeached Ed Kuba's testimony regarding Ed's relationship with defendant and Ed's recollection of the events of April 3. He contends that Liberti's testimony would have established that defendant and Ed maintained a relationship in the early 1990s after defendant had served his sentence for concealing the deaths and before he was tried for murder.

The record indicates that after the State completed its rebuttal case, the trial court asked defense counsel if any witnesses would be presented in surrebuttal. Counsel replied:

"MR. BRODY [defense counsel]: Yes, your Honor. We have— Before we call this particular witness, we would ask to be heard as to whether or not this witness would in fact be, be someone that we in fact could put on the stand.

He is several hours away at the present time. We informed the Court earlier of the potential of that."

The court asked counsel to make an offer of proof, and counsel stated that Liberti would testify that in 1990, he lived with defendant and worked for Ed's carpet company. Liberti would testify that defendant worked for Liberti in a subcontractor-type relationship and accompanied Liberti to the carpet company, where defendant and Ed spoke on a daily basis.

Counsel argued that Liberti's testimony was relevant to counter

the State's evidence of an adversarial relationship between defendant and Ed and to support defendant's testimony that Ed assisted him in hiding the victims' bodies. The State responded that the proffered testimony was collateral and that it established an ongoing relationship between Liberti and defendant, not between defendant and Ed. The court agreed that Liberti's testimony was collateral and sustained the State's objection to the testimony.

In making its ultimate ruling on defendant's guilt, the trial court again reviewed the materiality of Liberti's proffered testimony, stating:

> "Whether the defendant worked for Ed Kuba's carpeting outfit back in '92 as a subcontractor, a direct employee, doesn't really have any real impact on me. I know that was part of the rebuttal. Either I missed the point or there was no point. But I don't see it as showing any motive, bias or corroborating in any way the defendant's version of what happened nor do I believe it."

On appeal, defendant asserts that the trial court erred in denying his request for a continuance to allow Liberti to testify, and he argues that Liberti's testimony was material to show that Ed did not testify truthfully. Defendant contends that the trial court only determined that Liberti's testimony did not affect defendant's credibility and did not consider the effect of Liberti's testimony on the believability of Ed's account.

The State first responds that defense counsel did not request a continuance but instead made an offer of proof and requested the court's ruling on the materiality and admissibility of Liberti's testimony. Therefore, the State argues, the exclusion of Liberti's testimony resulted from the trial court's determination that the testimony was immaterial.

In his reply brief, defendant essentially agrees, stating that the "substantive issue before this court" is the correctness of the trial court's ruling on the relevancy of Liberti's testimony. However, defendant then reverts to his original argument, asserting that the issue of whether the trial court should have allowed a continuance to hear Liberti's testimony is properly before this court. Defendant also concedes that he failed to include that claim of error in his posttrial motion, and he acknowledges that issues raised on appeal are preserved for review by an objection at trial and the filing of a written posttrial motion raising the alleged error. See *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988).

Nevertheless, defendant contends, citing *People v. Williams*, 173 Ill. 2d 48, 85, 670 N.E.2d 638, 656 (1996), that the waiver doctrine is relaxed when the objection is based on the trial judge's conduct. In

*Williams*, the Illinois Supreme Court, despite the defendant's waiver of the issue, addressed the defendant's assertion that the trial judge refused to allow defense counsel to participate in composing a response to a note from the jury. *Williams*, 173 Ill. 2d at 85, 670 N.E.2d at 656. See also *People v. Davis*, 185 Ill. 2d 317, 343, 706 N.E.2d 473, 486 (1998) (supreme court elected to circumvent waiver to consider defendant's claim that trial judge refused to consider certain mitigating evidence at death penalty hearing); *People v. Vaughn*, 354 Ill. App. 3d 917, 926, 821 N.E.2d 746, 754 (2004) (appellate court relaxed waiver to consider defendant's claim that he was denied constitutional right to testify when, in admonishing defendant regarding that right, trial judge assumed "role of a trial strategist").

Here, unlike in *Williams*, *Davis* and *Vaughn*, the trial judge's actions were not the basis of the defendant's objection. As indicated by the above-quoted remarks of defendant's attorney, counsel requested a ruling from the court as to whether Liberti would "be someone that we in fact could put on the stand." After hearing the offer of proof, the trial court ruled on the relevance of Liberti's proffered testimony. Defense counsel expressly sought the court's ruling as to the admissibility of Liberti's testimony, and the court made its ruling without any formal request by defense counsel for a continuance.

Even absent waiver, and even if defendant had properly requested a continuance, we would not rule in defendant's favor on this point. Whether to grant or deny a motion for a continuance to secure a witness's presence is within the trial court's sound discretion, and its ruling will not be reversed on appeal absent an abuse of that discretion. See *People v. James*, 348 Ill. App. 3d 498, 504, 810 N.E.2d 96, 102 (2004). When reviewing the denial of such a motion, this court considers whether the defendant: (1) was diligent in attempting to secure the witness for trial; (2) has shown the testimony was material and might have affected the jury's verdict; and (3) was prejudiced by the denial of the motion for a continuance. *James*, 348 Ill. App. 3d at 504-05, 810 N.E.2d at 102.

Defendant argues that any formal request for a continuance would have been futile, given the trial court's ruling that Liberti's testimony would have been collateral. However, the court undertook the appropriate analysis of determining whether the defense had shown that Liberti's testimony was material and defendant would be prejudiced by its absence. Defendant presented a theory that Ed dictated his defense at his 1985 trial and helped him hide the victims' bodies. Although defendant asserts that Liberti's testimony would have directly refuted Ed's testimony, Ed did not testify that he had no contact with defendant in the 1990s. At its most liberal interpretation,

Liberti's testimony would have established that Ed and defendant, who are uncle and nephew, spoke to each other on occasion in the 1990s and may have had a working relationship. The conclusion that defendant and Ed therefore had acted together in 1983 to conceal the victims' deaths is tenuous at best. The trial court did not abuse its discretion in finding that Liberti's testimony was not material to defendant's case.

Furthermore, the trial court's ruling on this issue did not deprive defendant of his constitutional rights. While a defendant has a constitutional right to present witnesses in his defense (see, *e.g., People v. Willis*, 349 Ill. App. 3d 1, 18, 811 N.E.2d 202, 215 (2004)), that right is not unfettered and is subject to the standard rules for the admissibility of evidence. *Taylor v. Illinois*, 484 U.S. 400, 410, 98 L. Ed. 2d 798, 811, 108 S. Ct. 646, 653 (1988). "A trial court may reject offered evidence on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty or its possibly unfair prejudicial nature." *People v. Ward*, 101 Ill. 2d 443, 455, 463 N.E.2d 696, 702 (1984). Defendant's arguments on this point are therefore rejected.

### 3. Defendant's Contentions of Ineffective Assistance of Trial Counsel

■ Defendant's final argument on appeal is that this court must remand his case because the trial court failed to address his *pro se* complaints as to the ineffectiveness of his trial counsel. Defendant asserts that during the hearing on his posttrial motion, he alleged that his attorney: (1) was not properly prepared at trial and did not investigate several witnesses; (2) should have requested a continuance in light of discovery that was received the weekend before trial; and (3) failed to review his testimony from his 1985 trial.

At the hearing on defendant's motion for a new trial, defense counsel argued the merits of the written motion, after which the following exchange took place:

"THE COURT: Did you talk to Mr. Carini? Does he have any additional issues he would like to raise in the post-trial motion?

MR. BRODY: Mr. Carini would like an opportunity to speak.

DEFENDANT: Without having the record available, I don't want to waive any issues that may come up later. That's how it is done, I believe.

              \* \* \*

I didn't think we were properly prepared, and still several witnesses were needed to be investigated [*sic*] as well as other documentation that needed to be investigated, the Secret Service records, the social security checks of my grandfather that were cashed illegally by one of my uncles.

There were records by the Secret Service in 1985, and I didn't get clarification from any one of my attorneys on many of these issues and the whereabouts of John Kuba and his activities previously in March and in June.

\* \* \*

We were caught short a little bit in investigating some of the matters. When I was informed that the State turned over discovery which was somewhat old, and it was the weekend before trial which it could have caused a continuance [sic] which should have been looked into a little bit more than over the weekend with a consultation with me and Mr. Brody being that the State went into my 1986 [sic] testimony so thoroughly. We only spent a week and a half[,] only a few brief periods before my [second] trial started[ ]. And Mr. Brody going over my previous testimony a week and a half before trial, I don't think this was timely enough or effective enough waiting until the weekend, Saturday and Sunday before the Monday before trial, to go over my testimony and five hours on Sunday.

THE COURT: As to the pre-indictment delay issues, we heard arguments earlier, and the arguments we heard is [sic] a reiteration of that. The defense has failed to show anything more than speculation. There is no documentation of actual prejudice.

As to the issue of the lost subpoenaed material, I do recall reviewing that material. I know I made a statement on the record on finding it wasn't relevant to the trial. That's why it was not distributed. That's why it was sealed, and that's what happened to that. I suspect it is somewhere in the Clerk's Office. That is a large office.

As to the other issues, that is all again reiteration [of] issues raised prior to trial or during the trial.

The motion for new trial is denied."

Defendant did not present his claims to the court in a written motion for a new trial, immediately distinguishing this case from various Illinois Supreme Court precedents on which he relies, including *People v. Nitz*, 143 Ill. 2d 82, 572 N.E.2d 895 (1991), and *People v. Robinson*, 157 Ill. 2d 68, 623 N.E.2d 352 (1993). Even if he had presented his claims in written form, "[a] *pro se* motion for a new trial alleging ineffective assistance of counsel does not *per se* require appointment of new counsel to assist in the motion irrespective of the basis of the motion and in the absence of a request for new counsel." *People v. Williams*, 147 Ill. 2d 173, 250-51, 588 N.E.2d 983, 1014 (1991). Instead, the trial court is to examine the factual matters underlying the defendant's claim, and if the claim lacks merit or pertains to matters of trial strategy, then appointment of new counsel is not required. *Wil-*

*liams*, 147 Ill. 2d at 251, 588 N.E.2d at 1014. New counsel should be appointed only if the allegations demonstrate possible neglect of the case. *Williams*, 147 Ill. 2d at 252, 588 N.E.2d at 1014.

The State contends that defendant did not verbally request a new trial based on the ineffective assistance of counsel. The State further argues that the trial court is not required to investigate a defendant's claims of ineffectiveness of counsel where the defendant provided no documentary support for his complaints and where the allegations are presented to the court without a sworn affidavit and are *dehors* the record.

The State cites *People v. Miles*, 176 Ill. App. 3d 758, 531 N.E.2d 891 (1988), and *People v. Brandon*, 157 Ill. App. 3d 835, 510 N.E.2d 1005 (1987), in support of its contentions, and we find that authority to be illustrative. In *Brandon*, on the date set for the defendant's sentencing, and after defense counsel had filed and unsuccessfully argued the defendant's motion for a new trial, the defendant presented the trial court with a written motion containing *pro se* allegations of counsel's ineffectiveness. *Brandon*, 157 Ill. App. 3d at 844, 510 N.E.2d at 1011. The trial court stated it would stand on its prior ruling denying the posttrial motion presented by counsel. *Brandon*, 157 Ill. App. 3d at 840, 510 N.E.2d at 1008. On appeal, this court affirmed the trial court's dismissal of the defendant's claims without appointing counsel. *Brandon*, 157 Ill. App. 3d at 844-45, 510 N.E.2d at 1011. The court noted that the defendant's allegations of inadequate representation were unsworn, which it found to be an independent basis to deny the defendant's request for a new trial on the basis of factual allegations that were not included in the record. *Brandon*, 157 Ill. App. 3d at 845, 510 N.E.2d at 1011.

Defendant makes no attempt in his reply brief to distinguish *Brandon* or *Miles*. He contends that he is not required to prove the merits of his allegations at this stage, and he asserts that the trial court was required to examine his claims and appoint new counsel to represent him and independently evaluate his complaints.

Defendant's claims were presented verbally based on claims outside the record. Furthermore, the appointment of new counsel is not mandated if the claims lack merit or pertain to trial strategy. See *Williams*, 147 Ill. 2d at 251, 588 N.E.2d at 1014. Defendant does not name the specific witnesses that he asserts his trial counsel should have investigated, nor does he explain the contents of the discovery that was received shortly before trial or explain how his case was prejudiced as a result of that timing. Decisions on what evidence to present and which witnesses to call on a defendant's behalf are matters of trial strategy. *People v. Ward*, 187 Ill. 2d 249, 261-62, 718 N.E.2d

117, 127 (1999). In addition, defendant's claim on appeal that counsel did not adequately review his 1985 trial testimony is dubious, given defendant's admission that his earlier testimony was falsely given. Defendant did not explain to the trial court how his counsel's review of his prior testimony, in defendant's words, "a week and a half before trial" affected his defense in the instant case.

Although defendant argues that some exchange must take place between himself and the trial court for the court to have adequately considered his contentions, the court's evaluation of his arguments can be based on "its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *People v. Moore*, 207 Ill. 2d 68, 79, 797 N.E.2d 631, 638 (2003). Because we find defendant's claims to be either meritless or based upon trial strategy, we affirm the trial court's dismissal of defendant's *pro se* claims that his trial counsel was ineffective.

## CONCLUSION

Accordingly, for all of the foregoing reasons, we affirm defendant's convictions for the first degree murders of John Kuba and Joanne Seaquist.

Affirmed.

CAMPBELL, P.J., and NEVILLE, J., concur.