NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 210675-U

NO. 4-21-0675

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 9, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Morgan County |
| AVERY T. BERRY, | ) | No. 14CF117 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John M. Madonia, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Harris and Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held:*    1. The trial court did not deny defendant of his right to present a defense.

2. Defendant failed to establish he was prejudiced by his trial counsel's alleged deficient performance.

3. Defendant is not entitled to have his first degree murder conviction reduced to second degree murder.

4. The trial court did not err in not providing the jury with a second degree murder instruction based on "serious provocation."

5. The State's closing argument did not deny defendant his right to a fair trial.

6. Defendant's sentence was not excessive based on the record in this case.

7. Defendant failed to establish he was prejudiced by the alleged deficient performance of his post-trial counsel, who was appointed after a preliminary hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984).

¶ 2    In October 2014, the State charged defendant, Avery T. Berry, with three counts

of first degree murder for causing the death of Marcus Jackson. In July 2016, a jury found defendant guilty of first degree murder. The jury also found defendant personally discharged a firearm that caused Marcus Jackson's death. In October 2016, the trial court sentenced defendant to 50 years' imprisonment. When defendant first appealed, this court in *People v. Berry*, 2019 IL App (4th) 160946-U, ¶ 3, remanded this case to the trial court for proceedings pursuant to *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). After an evidentiary hearing in November 2021 on defendant's post-trial claim his trial counsel was ineffective, the trial court denied defendant's posttrial motion. Defendant appeals, raising the following issues from both his original appeal and the *Krankel* proceedings: (1) the trial court denied defendant his constitutional right to present a defense by precluding defendant from introducing certain evidence; (2) his conviction should be reduced to murder in the second degree; (3) the trial court erred by refusing to give a jury instruction for second degree murder based on serious provocation; (4) defendant was denied his right to a fair trial because the State's closing argument included numerous improper comments which both misstated the law and inflamed the jury; and (5) the *de facto* life sentence imposed by the trial court was a disproportionate sentence under the proportionate penalty clause of our state constitution and excessive. Finally, scattered throughout defendant's brief, defendant makes various arguments why his trial counsel and his post-trial counsel were constitutionally ineffective. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On October 27, 2014, the State charged defendant with three counts of first degree murder for causing Marcus Jackson's death in Jacksonville on October 24, 2014 (720 ILCS 5/9-1(a)(1), (2) (West 2014)). Defendant's jury trial commenced in July 2016.

¶ 5        Joshua Radliff, a Jacksonville police officer, testified he responded to both a

- 2 -

disturbance and shots fired call at the 400 block of West Douglas Avenue on October 24, 2014. When he arrived at the intersection of Fayette Street and West Douglas Avenue, his lieutenant instructed him to follow a blue Mazda van, which was transporting a shooting victim to the hospital. He located the vehicle and then cleared traffic for it. He learned the shooting victim was Marcus Jackson.

¶ 6　　　　Arielle McGee testified she had contact with Marcus around 11 p.m. on October 23, 2014, on Clay Street in Jacksonville. Mondre White and Marcus's brothers, Gerald Jackson and Marquies Jackson, were also present. Gerald was Arielle's boyfriend. When Marcus decided to go to Shakil Berry's home at the corner of Fayette Street and Douglas Avenue, she, Marcus, Gerald, and Marquies went in one car to the area of Shakil's residence and parked. Shakil is defendant's brother. The four individuals then walked to Shakil's house, which was located on the corner of Fayette Street and Douglas Avenue. According to Arielle, people were both inside and outside the house. Gerald and Marcus then started arguing with Shakil. During part of the argument Shakil was holding his gun up. Marcus told Shakil to put down the gun because he was not going to use it. Marcus also told Shakil he wanted to have a fist fight. Shakil then gave the gun to defendant, and people started fighting, including Arielle. At some point, she looked over and saw Marcus on top of Shakil on the ground beating him up. Defendant was not fighting with anyone. She then heard three gunshots and stopped fighting. According to her testimony, she saw defendant fire the gun from the back porch at Marcus who was three feet away. Defendant then ran from the scene.

¶ 7　　　　On cross-examination, Arielle testified she knew Marcus and the others were going to fight Shakil Berry at his home and heard Shakil yell at defendant to shoot Marcus. When they arrived at the house, a party was happening with around 12 or 13 people present.

While they went to Shakil's house to fight, Arielle said neither she, Gerald, Marquies, or Marcus had any weapons. The gun Shakil gave defendant was the only weapon she saw.

¶ 8        Gerald Jackson, who was incarcerated for possession of a firearm and delivery of a controlled substance, testified he had also been convicted for the manufacture and delivery of a controlled substance. On the night of the incident, Gerald received a phone call saying Marcus was fighting at a party. When his girlfriend, Arielle, got home, they met up with Marcus on Clay Street. Gerald said Marcus was angry because someone had pulled a gun on him at a party. After being together on Clay Street for about 30 minutes, Gerald, Marcus, Arielle, and Marquies went to a home on the corner of Fayette Street and Douglas Avenue to engage in a fight as revenge for what happened to Marcus. Like Arielle, Gerald said they had no weapons and did not intend to kill anyone but did intend to hurt someone badly in a fist fight. At the house, Marcus told Shakil to come outside. Shakil had his gun when he came outside. Gerald told Shakil, "I don't want to kill you. I want to beat the shit out of you." Shakil later gave his gun to defendant but picked up a brick and threw it at Marcus, which caused everyone to start fighting. Gerald heard Shakil telling defendant to shoot Marcus and then heard gunshots. He saw defendant three to four feet from Marcus shooting. Defendant then ran off. Shakil got the gun and took it in the house. Marcus was unresponsive. Gerald, Marquies, and Mondre—who had arrived at some point—picked Marcus up and put him in a van. On cross-examination, Gerald said there had been no problems before that night. Gerald testified he was about 6 feet tall and weighed between 235 and 250 pounds. Before they went to Shakil's house, Marcus asked for a gun but they did not get one.

¶ 9        Jalana Woods, who had prior retail theft convictions, testified she saw Marcus and Shakil fighting. Marcus was on top of Shakil. She also saw defendant shoot straight at Marcus

from three to four feet away. She only saw defendant with a gun and heard five shots.

¶ 10　　　　Marquies Jackson, who was previously convicted of manufacture and delivery of a controlled substance on two occasions and possession of a controlled substance, testified he was with his brother, Marcus, on the night of the shooting. They went to a party for Seville Jackson at a bar on the square in Jacksonville around 10 or 11 p.m. Shakil and defendant were also present. At some point during the party, something happened that made Marcus very angry. Marquies later saw Shakil pull a gun from his back pocket and point it at Marcus. Marquies testified he got his brother out of the bar at that point, and they went to Clay Street. Marcus was mad because he got jumped at the party while Marquies was outside. Marquies testified he had never seen Marcus like that. According to Marquies, after leaving Clay Street, he, Marcus, Arielle, and Gerald drove to Fayette Street and went to Laprice Jackson's house. Marquies believed an after-party was happening and Shakil would be there. Marcus knocked on the door and told Shakil to come outside and fight. Marquies also testified no one in their group had any weapons.

¶ 11　　　　Shakil came out of the house, climbed on top of a vehicle, and started "going off" verbally. Marquies was worried Shakil had a gun. Shakil then got off the car, and Marquies started focusing his attention on the person standing in front of him. He did not see defendant at that time. Shakil then threw a brick, and everyone started fighting with whoever was in front of him or her. Marquies and another man started fighting and went to the ground. He then heard gunshots and looked in the direction of the sound but did not see anything. He jumped up and ran to the front of the house on Fayette Street and saw defendant. On cross-examination, Marquies said he had not heard that Marcus threw a woman into a glass window.

¶ 12　　　　Mondre White, who had been convicted of aggravated battery and was currently

in the Morgan County jail, testified Marcus was his best friend and like a brother. On the night at issue, he went to a party in downtown Jacksonville for Seville Jackson's birthday with Marcus and a couple of his cousins. They were hanging out and drinking. Everyone was having a good time until Marcus and Shakil had an altercation. Shakil pulled a gun, cocked it, and acted like he was going to point it at Marcus. Mondre helped get Marcus out of the bar and into a truck and went to Clay Street. Marcus was mad. Marcus said he was going to go to a party to fight Shakil. Marcus, Gerald, Arielle, and Marquies left Clay Street in Gerald's car. Mondre was in no hurry to follow them because he did not think they would fight. He left Clay Street with Maryann Smith and his two cousins 10 or 15 minutes later. Maryann Smith did not want to go to where the party was happening so she dropped him, Nate White, and "Little Marcus" off at the corner of Fayette Street and Reid Street. Mondre testified he heard screaming and ran to the party and saw everyone fighting. He saw Marcus was on top of Shakil, heard Shakil tell defendant to shoot Marcus, and then saw defendant shoot Marcus from behind three times. Shakil and defendant then ran from the scene. Shakil did not appear to have trouble running. Mondre chased them for a short distance, but then went back and called 911. Instead of waiting for the ambulance, he and some other people put Marcus in a van and went to the hospital. He did not see anyone with a gun other than Shakil and defendant that night.

¶ 13 On cross-examination, Mondre testified he was approximately 5 feet 11 inches tall and 200 pounds. He did not know Shakil lived at the house where they went to the party and did not know Marcus wanted to take revenge on Shakil. The trial court sustained the State's objection when defense counsel asked Mondre if Marcus liked to fight.

¶ 14 Maryann Smith testified she was also at Clay Street hanging out and did not see anyone with a weapon. Marcus left Clay Street with Gerald, Arielle, and Marquies. Marcus was

angry. She then took Mondre and Nathan White to the area where the others had gone and let them off at the corner of Fayette and Reid Streets. They ran toward the party, and she drove off. After hearing gunshots, she then went to where the party was happening and saw Mondre, Gerald, Marquies, and Nathan carrying Marcus. She drove them to the hospital in someone else's car.

¶ 15 Keely Brown testified she was also at the birthday party and saw Shakil and Marcus arguing before Shakil pulled out a gun. When Marcus told Shakil he was going to have to shoot him, Shakil cocked the gun. Marcus's friends took him downstairs. She left the party about 20 minutes later and went home but went to Laprice Jackson's house when she heard people were fighting. She saw three different fights happening with one being between Shakil and Marcus. She saw Marcus was on top of Shakil and saw defendant standing on the porch not fighting. Shakil then told defendant to shoot Marcus, which defendant did four or five times.

¶ 16 Brittani Frank testified Laprice Jackson had been pushed through glass at the birthday party so she went to Laprice's house to check on her. When Marcus knocked on the door, about six people were there. Defendant and Shakil went outside. Shakil had a brick and got on Laprice's car. Marcus and Shakil were yelling at each other. Marcus told Shakil to put the brick down so they could fight with no weapons. After Shakil swung the brick at Marcus, the fights started. She saw Marcus and Shakil fighting. When Marcus was on top of Shakil, Shakil told defendant to shoot Marcus. Defendant then shot Marcus. She did not see anyone with a gun that night except defendant.

¶ 17 Officer Lucas Poore of the Jacksonville Police Department testified he encountered Shakil in the vicinity of the disturbance around 2 a.m. Due to Shakil's location, Poore thought Shakil might have been involved in the disturbance. He observed Shakil's

physical condition for indications whether he was a possible victim or perpetrator. Shakil was well dressed, wearing jeans and a black shirt. He had some debris on the back of his shirt but otherwise looked in fine physical condition. He did not walk with any sort of limp and did not appear to have any physical injuries. He did not look like he had been beaten. Other than the debris on his back and the fact he was sweating, Poore saw nothing indicating he had been in a fight. He was with Shakil for about an hour and did not hear him complain of any pain or injuries.

¶ 18            Detective Brad Rogers of the Jacksonville Police Department testified he interviewed Shakil during the early morning hours of October 24, 2014, and his physical appearance seemed normal without observable facial injuries or bleeding. He also did not see any injuries to Shakil's arms or hands. Shakil did not ask for medical attention or claim he was injured. Rogers told multiple members of defendant's family he needed to speak with defendant. He also requested assistance from other law enforcement agencies. Rogers also testified the police department put out some press releases seeking defendant's location. The United States Marshal Service located defendant in St. Louis 52 days after the shooting. We note part of Rogers's testimony is missing from the record.

¶ 19            Dr. Nathaniel B. Patterson, a forensic pathologist, testified as an expert in forensic pathology. Dr. Patterson performed an autopsy on Marcus and determined he had been shot in the back, in the shoulder, and in the leg. He determined the cause of death was gunshot wounds to the back, left shoulder, and left thigh. The doctor also found blunt force injuries on Marcus's face, hand, back, and thigh. Dr. Patterson noted the blunt force injury to Marcus's face could have been caused by him being punched. He also had a scrape on his right cheek and the right side of his nose and abrasions on the left side of his nose, his lip, and beneath his lower lip on his

chin. He also had a laceration on the inside of his upper lip, which could have been caused by a punch, and bruises on his scalp and lower lip. Dr. Patterson indicated these blunt force trauma wounds occurred right around the time of his death. Dr. Patterson indicated Marcus was 5 feet 9 inches tall and weighed 155 pounds.

¶ 20 On cross-examination, the State objected when defense counsel asked if any blood alcohol content (BAC) testing was performed. The State argued Dr. Patterson was only testifying as to the cause of death, which the victim's BAC did not affect. The State indicated blood alcohol testing was done, but the results were not relevant to Dr. Patterson's testimony. Defense counsel argued the test results were relevant to show how complete the examinations of the victim were. The trial court sustained the State's objection. Defense counsel asked to make an offer of proof. Outside the presence of the jury, the court stated it had ruled the BAC results were not relevant to the stated cause of death by the expert witness. The court also indicated going into that evidence raised other concerns, including whether or not the doctor was qualified to answer any questions about the test results. During defendant's offer of proof, Dr. Patterson testified blood and fluid from the eyes was drawn during the autopsy and sent to a reference laboratory for testing. The test results showed Marcus had a "not especially high" amount of Alprazolam (Xanax) in his system. His BAC was 0.06. He also had tetrahydrocannabinol and caffeine in his system.

¶ 21 Defendant was the only witness for the defense. He testified he was 20 years old and had never been convicted of a crime. On October 23, 2014, he helped set up a birthday party for Seville Jackson at a bar in downtown Jacksonville. The party started about 10:30 p.m. and defendant was drinking. During the party, Seville and Marcus had an argument and had to be separated. Laprice Jackson helped separate the two men. Marcus then threw Laprice into a glass

stand. Marcus and another man then started fighting. At that point, Seville's father stopped the party and told everyone to leave. Marcus and the people he was with refused to leave the bar. Shakil then was arguing with Marcus and drew a gun. Marcus said Shakil would have to shoot him and refused to leave. People then stepped between the two and everyone left.

¶ 22    Defendant testified he went to his home on Fayette Street and Douglas Avenue with Shakil, Laprice Jackson, and some members of her family. Laprice had cuts on her legs and was bleeding. A few people came by the house to check on her. Then Marcus knocked at the front door. Someone opened the door, and a few people stepped outside. Shakil and defendant went outside after everyone else. Neither Marcus nor anyone else in his group had been invited to the house. Defendant testified no party was happening, and he did not know why Marcus was there. Once defendant was outside, Marcus and his brothers were talking about fighting and making threats. Shakil jumped on Laprice's car, exchanged words with Marcus and his group, waved his fingers a little bit, jumped off the car, and then threw a brick. At that point, the fight started. Defendant testified Gerald, Marquies, Marcus, Shakil, defendant, and others were fighting. He did not remember who all was involved. Marcus and Shakil were fighting each other. It was very noisy, people were yelling and screaming, and he felt scared and his adrenaline was pumping. He testified he had been confronted with a similar situation a few weeks earlier and similar things had been happening all summer. The State did not object to this testimony. The fight between Marcus and Shakil moved into the backyard where it was very dark. Defendant also moved toward the backyard following Shakil.

¶ 23    According to defendant, he went to the party at the bar carrying a gun for protection and still had it with him when Marcus and the others came to Fayette Street and Douglas Avenue. Defense counsel asked if defendant believed he needed protection from

someone in particular or from some group of people and, if so, why. The State objected, arguing the question called for irrelevant evidence. The trial court sustained the objection. Defendant then testified he could see a lot of scuffling on the ground between Marcus and Shakil and was "[n]ervous, scared, [and] afraid" because of his brother's situation. Defendant denied firing his gun at Marcus but admitted firing the gun in Marcus's direction three times. When asked why he fired the gun, defendant said he feared for his brother's life but did not intend to kill Marcus. Defendant said the first shot was from 6 to 10 feet away from Marcus and the next two shots were about 10 to 15 feet away. When asked why he fired multiple shots, defendant said he did not think the first shot hit anything. He said he was trying to stop the fight. After the third shot, defendant testified he ran.

¶ 24        On cross-examination, when asked why he fled to St. Louis after the shooting, defendant testified he already had plans to go before the shooting and did not know the police were looking for him. The first three weeks he was gone he did not talk to any of his family. When he did later talk to them, they did not tell him he killed anyone but did say he had a warrant. He did not turn himself in because he did not believe he had done anything wrong. Even though he fired three shots in the direction of a person, defendant testified he did not believe the police would want to talk to him, and he did not want to talk to them. Defendant did not have a license to carry a firearm and did not know what he did with the gun after the shooting.

¶ 25        Defendant acknowledged Marcus did not knock down the door to the house. He said he was scared when Shakil had the brick in his hand but did not call 911 because he did not have a phone with him. The State asked defendant if he thought Shakil was in danger of being killed because he was being severely injured. Defendant responded it was because their lives

were threatened all summer. Defendant said he could not see any of Shakil's injuries because it was dark. He also denied or at least did not recall Shakil telling him to shoot Marcus. He drew his gun because he did not know if his brother was okay or not. Without firing a warning shot, he fired the gun in Marcus's direction three times. He claimed he was too far away to physically intervene even though he was only 6 to 10 feet away. Defendant acknowledged nothing was wrong with his legs but said he could not help his brother due to his state of mind and shock. Defendant claimed he was unable to tackle Marcus or hit him with the butt of the gun.

¶ 26         On redirect examination, defense counsel asked about defendant's life being threatened all summer. Defendant said, "There were previous altercations." The State objected. Outside the presence of the jury, the trial court heard arguments on the State's objection. Defense counsel argued the State opened the door to his question during its cross-examination. The State denied this, arguing defense counsel was relying on a non-responsive answer given by defendant. The trial court noted defense counsel did not go into this during his direct examination of defendant. The court noted it was also concerned whether defendant's self-serving, non-responsive answer to the State's question could open the door to further questions on redirect examination. The State argued defense counsel's question was both outside the scope of the State's cross-examination and irrelevant.

¶ 27         After the court reporter typed out part of defendant's testimony, the trial court noted defense counsel asked defendant on direct examination whether he had been confronted with a situation like this before. Defendant responded yes, including a few weeks before the shooting and also all summer. The court then noted defense counsel did not follow up with any questions about what else had happened.

¶ 28         The court next directed its attention to what happened during defendant's cross-examination. The court indicated the State was asking defendant about the alleged fear defendant had for his brother's life when Shakil and Marcus were fighting. Defendant said he thought Shakil was in danger of being killed at any moment. When the State asked if this thought was based on Shakil being injured in some way, defendant responded his fear was based on the fact their lives had been threatened all summer.

¶ 29         Defense counsel continued to assert he should be allowed to ask about these other incidents on redirect examination. The State responded the other incidents were not relevant, which was the basis for the objection on redirect examination which the trial court sustained. The State also argued the door had not been opened for this evidence by any question the State asked on cross-examination because the State was only asking defendant what was in his mind in the early morning hours of October 24.

¶ 30         The trial court noted the State did not open the door for defense counsel's questions on redirect examination and defendant could not open the door with a non-responsive answer. The court told defense counsel the time for him to ask about the prior incidents was during defendant's direct examination. Defense counsel responded the point of his question was to point out the danger to which defendant and his family had been exposed during the early morning hours of October 24. The trial court responded defendant was able to get that information out during defendant's direct and cross-examination through a non-responsive answer. However, defense counsel's efforts to go into this further on redirect examination was beyond the scope of the State's cross-examination of defendant. The court sustained the State's objection. Defense counsel then continued his redirect examination of defendant, and defendant testified he could not have come to his brother's aid short of shooting Marcus because of

defendant's emotions, confusion, and the situation at hand. Defendant testified he was scared and did not think he could help his brother.

¶ 31   During the jury instruction conference, the trial court denied defendant's request to give the jury a second degree murder instruction based on serious provocation but allowed a second-degree murder jury instruction on imperfect self-defense.

¶ 32   In its closing argument, the State acknowledged it was Marcus and his brothers that went to the house on Fayette Street and Douglas Avenue looking for a fight. Marcus did not bust down the door but let Shakil know he was there to beat him up. The State argued neither Shakil nor defendant had to go outside but instead could have called the police. Further, when the fight started, even Shakil had agreed to fight without weapons. However, at some point during the fight, Marcus was getting the better of Shakil, and defendant shot Marcus from behind at close range three times and killed him. The State argued it had proved defendant was not acting in self-defense and instead was guilty of first degree murder. As to whether defendant should only be convicted of second degree murder, the State argued defendant had not met his burden of showing he believed he was reasonably justified when he killed Marcus. The State noted Shakil walked away from the fight with Marcus with no injuries.

¶ 33   Defense counsel argued the State did not present any evidence the police did a crime scene investigation and Marcus's clothes were not tested in an attempt to determine the range at which Marcus was shot. Defendant also challenged the credibility of the State witnesses, many of whom were convicted felons and friends of Marcus's family. Counsel also argued the case would not be happening if not for Marcus's actions. Further, counsel argued defendant's actions were reasonable because he wanted to stop his brother from being hurt and did not intend to kill Marcus.

¶ 34        During its rebuttal argument, the State asserted the defense arguments were nothing but "smoke and mirrors."  The State pointed out the Jacksonville police did a good job in this case and the crime scene evidence defense counsel pointed out as missing would have been of no assistance.  The State argued defense counsel was focusing on things that did not make a difference in the case.  The State also commented that some of the witnesses it called were convicted criminals.  Some witnesses testified in jail uniforms and were shackled.  However, the State then pointed out defendant was also a jail inmate but was dressed in street clothes.  The State argued it presented its witnesses as they were.

¶ 35        The State also argued defendant's argument he was acting in self-defense was insulting and offensive.  The State noted defendant shot an unarmed man in the back.  The State also pointed to defendant fleeing to St. Louis for 52 days after the shooting and his failure to contact the police.  According to the State, defendant's argument he thought it was reasonable to shoot Marcus in the back made no sense based on the facts presented.

¶ 36        The jury found defendant guilty of first degree murder.  The jury also found defendant personally discharged a firearm during the commission of the offense that proximately caused Marcus's death.

¶ 37        On July 26, 2016, defendant filed a *pro se* motion alleging his trial counsel failed to investigate whether a *bona fide* doubt of his fitness to stand trial existed.  Defendant asked for a psychiatric examination to determine his fitness during his trial and at sentencing.  As stated in this court's prior order:

> "The motion alleged defendant had a history of mental-health issues, including
> (1) diagnoses for oppositional defiant disorder [(ODD)] and
> attention-deficit/hyperactivity disorder (ADHD), and (2) prior hospitalizations for

suicidal ideations. The motion stated '[t]he failure of defense counsel to investigate apparent problems with defendant's mental health may be deficient performance as defined by the first prong of [*Strickland v. Washington*, 466 U.S. 668 (1984)].' The motion further alleged, 'Defense counsel was objectively unreasonable and provided deficient performance by not investigating the defendant[']s 'mental history' (or) by failing to seek a fitness hearing based on the evidence which suggest that the defendant's adolescent maturity was "severely under-developed" based on the prior diagnosis.' " *Berry*, 2019 IL App (4th) 160946-U, ¶ 7.

Defendant argued "experts" had previously diagnosed defendant as suffering from psychiatric disorders that lowered his intelligence and made him prone to impulsive behavior, which more than likely prevented or prohibited defendant from effectively aiding his trial counsel.

¶ 38    On August 15, 2016, defendant's trial counsel filed a motion for a new trial. On August 30, 2016, counsel filed a response to defendant's *pro se* motion for a psychiatric exam, acknowledging defendant made him aware defendant had been diagnosed with ADHD. However, during many conferences with defendant, defendant indicated he was interested in assisting in his defense and expressed knowledge of events leading up to and following the shooting. Counsel stated he believed defendant was always truthful with him. Counsel indicated he went over and discussed in detail the discovery in the case with defendant. According to trial counsel, defendant gave him detailed information about various individuals involved and a chronological listing of events preceding the shooting. However, defense counsel indicated he had no objection to the court appointing a psychiatrist to examine defendant. On August 30, 2016, the trial court indicated it would not rule on defendant's *pro se* motion because defendant

- 16 -

was represented by counsel.

¶ 39 At a hearing on October 5, 2016, the trial court denied defendant's motion for a new trial and proceeded to the sentencing hearing. The State indicated it had no evidence in aggravation not contained in the pre-sentence investigation report (PSI). The court allowed a letter, which was attached to the PSI, from the mother of Marcus's child to be read for the record. The defense called several witnesses. Deidra Lockhart, defendant's mother, testified defendant was a good kid who was very protective of his family and his siblings. While not knowing what happened, she believed defendant feared for his life and his brother's life. On cross-examination, she said defendant had been sent to the psychiatric ward on two occasions as a youth for suicidal ideations and was prescribed medicine for his depression. She indicated this information should have been brought up in court.

¶ 40 Alvis Berry, defendant's father, testified defendant was a typical, good kid. He essentially testified his son's behavior did not match his age because he was always giggling, laughing, and smiling. He was aware defendant had prior problems with people in Jacksonville and the police failed to do anything. He indicated defendant would not physically harm anyone unless he was defending himself or his brother. Moana Lou, defendant's stepsister, said defendant did not exhibit any violent tendencies unless violence came to him. Eugene Lewis, defendant's brother, said he did not believe defendant was either aggressive or a killer.

¶ 41 The State asked for a sentence of between 30 to 40 years on the first degree murder conviction and an additional 30 to 40 years for the firearm enhancement. Defense counsel asked for the minimum sentence, arguing they would not be at the sentencing hearing if Marcus had not been looking for a fight. Defense counsel also noted jail personnel said defendant was a model prisoner. Defendant asked for the minimum possible sentence.

¶ 42        Defendant exercised his right to make a statement.  He said he was not the

monster some people were making him out to be, he regretted everything that happened, and he

did not want or intend for anyone to die.  He said he still feared for his family's life, noting it

seemed people thought it was okay that his brother's house was shot at and his three-year-old

nephew was almost shot.  He said law enforcement did nothing about these situations.

According to defendant, this situation could have been avoided if anyone was willing to help.

He said he was sorry for what happened and sent his regards to the victim's family.

¶ 43        The trial court sentenced defendant to a prison term of 50 years with 3 years of

mandatory supervised release—25 years for first degree murder and the 25-year firearm

enhancement.  The court noted it had no discretion with regard to the 25-year firearm

enhancement.  The court indicated it did not think the minimum sentence would be appropriate

based on the circumstances of this murder.

¶ 44        On November 3, 2015, defense counsel filed a motion to reconsider his sentence.

Defendant argued his sentence was excessive and the trial court failed to consider defendant

acted under a strong provocation.  In addition, the court failed to consider the substantial grounds

to excuse or justify defendant's conduct.  On December 20, 2016, the trial court denied the

motion.

¶ 45        On December 22, 2016, a notice of appeal was filed.  On January 9, 2017, the

Office of the State Appellate Defender (OSAD) filed an amended notice of appeal.  On August 7,

2019, this court remanded this case for the trial court to conduct an inquiry pursuant to *Krankel*,

102 Ill. 2d 181, 464 N.E.2d 1045, into defendant's *pro se* posttrial claim of ineffective assistance

of counsel.  *People v. Berry*, 2019 IL App (4th) 160946-U, ¶¶ 1-3.  This court indicated it

retained jurisdiction over the case.  *Berry*, 2019 IL App (4th) 160946-U, ¶ 3.  According to this

court's order, if defendant was not satisfied with the proceedings on remand, he could appeal again and raise any supplementary claims related to those proceedings. *Berry*, 2019 IL App (4th) 160946-U, ¶ 20.

¶ 46 On remand, defendant, on September 23, 2019, filed, *pro se*, a motion to flesh out his claims of ineffective assistance of counsel. Defendant alleged he had made his trial counsel aware of his prior history of psychological problems which would likely impair his ability to aid in his defense. Had defense counsel looked into this, he would have discovered defendant had been diagnosed with ODD and ADHD and twice placed in a children's mental ward for suicidal ideations. Defendant argued his attorney's failure to investigate constituted deficient performance under *Strickland*, 466 U.S. 668. Defendant alleged this also resulted in him being tried and sentenced while unfit. Further, defendant stated he was prejudiced because a "reasonable probability" exists the result in this case would have been different absent his attorney's deficient performance. Defendant also alleged his trial counsel was ineffective for failing to call Shakil and Laprice Jackson as witnesses and failing to argue the inconsistencies between the testimony of the State's witnesses. He also argued his counsel was ineffective for not focusing on Gerald Jackson's background and weapons charge to show Marcus and his brother were capable of carrying weapons.

¶ 47 According to defendant, his trial counsel also failed to properly cross-examine Detective Rogers and Officer Poore about their testimony Shakil did not have any physical injuries in the hours after the shooting. Defendant also argued his trial counsel failed to point out the Jacksonville Police Department knew about the ongoing conflict between defendant and his family and Marcus and Marcus's family but failed to do anything. Further, defendant argued his trial counsel was ineffective for failing to object to improper comments the State made during its

closing argument. Finally, defendant argued his trial counsel failed to argue the trial court failed to consider the factors applied to juveniles when sentencing defendant because he had the mind of a 15-year-old person.

¶ 48 Defendant also attached "affidavits" from Shakil Berry and Laprice Jackson describing the events which led to the death of Marcus. Shakil indicated he would have provided complete and accurate information if he was called as a witness on defendant's behalf. In Shakil's "affidavit," he denied ever pulling a gun on Marcus at the birthday party. At the house, he was fighting with Gerald Jackson, who knocked him down with a good punch. As Shakil was getting up, Marcus ran up saying it was time for the two of them to fight. Shakil said he stepped to the side and punched Marcus, causing him to fall. Marcus got up and Shakil knocked him down again. Shakil and Marcus then started wrestling on the ground. Shakil tried to get up and "take off," but Marcus grabbed Shakil's leg and Shakil fell. Shakil then heard Jamie Haley yell his name and then heard three gun shots. Shakil then ran and was stopped by Officer Poore.

¶ 49 In her affidavit, Laprice Jackson indicated Marcus and his family had been "harassing us" anytime they were together. With regard to Marcus being shot, Laprice indicated she did not remember seeing defendant after the first punch of the fight between everyone. Her affidavit stated it was "pitch black" where Marcus and Shakil were fighting. She did not provide any details about the fight between Marcus and Shakil or defendant shooting Marcus.

¶ 50 On September 24, 2019, the trial court started a preliminary *Krankel* inquiry. A new trial judge was assigned to preside over the post-trial *Krankel* proceedings. In addressing defendant, the court indicated one of defendant's major contentions was his trial counsel ignored or did not properly pursue issues regarding defendant's mental health. The court indicated it wanted defendant to speak to this issue and then the court and defendant would address the other

allegations defendant raised in the pleading he filed on September 23, 2019.

¶ 51　　　　Defendant told the trial court he was diagnosed with ADHD and ODD, which he and members of his family told his trial counsel many times before his trial. Defendant also said he told his counsel he was having trouble understanding the nature of the proceedings and what counsel was trying to accomplish on defendant's behalf. According to defendant, he did not raise these issues with the trial court because he thought it was up to his trial counsel to provide the trial court with this information. The court then questioned defendant's trial counsel, Bruce Locher. Counsel said the information about defendant's mental health was not provided to him. However, counsel indicated he was present on short notice for what he believed was a status hearing and had not reviewed his file for this case. Counsel stated he had retired from practicing law and his case files were in storage. As a result, the court stated it would reconvene the hearing on October 18, 2019.

¶ 52　　　　On October 18, 2019, the trial court reconvened the preliminary *Krankel* inquiry. At this hearing, Locher told the court defendant briefly told him about his mental health history. Counsel noted defendant had limited contact with different agencies but none of the contacts influenced what happened in this case. Counsel stated nothing about defendant's mental health issues gave him any concern as to defendant's ability to be involved in this case. The court then asked counsel when he became aware of defendant's history of mental health issues. Counsel said that on December 30, 2014, defendant told him he had been diagnosed with ADHD. Subsequently, counsel did not recall requesting or receiving anything supporting or verifying any representation made by defendant about his mental health. Counsel stated he did not observe anything that made him think defendant was influenced at all by any disability. Counsel said he neither saw nor read anything that caused him any concern about the voluntariness of any

statements defendant made to the police. In response, defendant said he told defense counsel he had ADHD and it was counsel's job to investigate that condition. Defendant said he told his trial counsel multiple times that his mental health was a real issue to pursue.

¶ 53 The trial court found a factual dispute existed regarding what defense counsel knew about defendant's psychiatric disorders. The court indicated it would appoint another attorney for defendant to look at the issue regarding defendant's mental health history and some of the other issues raised by defendant after his trial.

¶ 54 On November 25, 2019, the trial court appointed attorney Thomas H. Piper (*Krankel* counsel) from the Morgan County Public Defender's Office to represent defendant regarding his claims. According to the court's docket entry, *Krankel* counsel "shall review the contentions of the Defendant that have been filed, and investigate the need to make any amendments to a Motion for a New Trial in order to bring to the court's attention all of Defendant's claims of trial counsel's ineffective assistance."

¶ 55 On August 12, 2021, *Krankel* counsel filed a motion for leave to file a petition for postconviction relief. The motion stated, "Counsel believes that the *pro*[ ]*se* Motion to Flesh Out Claim of Ineffective Assistance [of] Counsel Under *Krankel* Law has been granted and therefore, best practice is for counsel to file [a] Petition for Post[-]Conviction Relief pursuant to 725 ILCS 5/122-1 *et seq*."

¶ 56 On August 19, 2021, the trial court held a status hearing on defendant's post-trial motions. *Krankel* counsel moved to withdraw his motion for leave to file a petition for postconviction relief, which the trial court allowed. The court entered a docket entry stating:

> "At this hearing, the court clarified the status of the proceedings and confirmed that an evidentiary hearing was necessary to resolve Defendant's allegations of

ineffective assistance of trial counsel that he asserted in his *pro se* post-trial

motion. Counsel for Defendant has requested additional time to consult with

potential witnesses and prepare for hearing on the motion. Motion to continue

granted without objection by the State."

The court scheduled the evidentiary hearing on defendant's motion for November 10, 2021.

¶ 57 On November 10, 2021, the trial court held the evidentiary hearing as scheduled.
At the start of the hearing, the court stated it was concerned about *Krankel* counsel's ability to
meet with defendant to discuss the issues that needed to be addressed regarding defendant's trial
counsel's performance. The court also indicated he did not want a situation where they had
subsequent allegations that were not a part of that day's hearing.

¶ 58 *Krankel* counsel suggested the court could make an inquiry of defendant whether
he felt he had an adequate opportunity to discuss with *Krankel* counsel the issues he had
regarding his trial counsel's performance. The court then asked defendant if he had adequate
opportunity to talk to *Krankel* counsel and address the issues the court needed to hear at the
evidentiary hearing and to discuss witnesses that could assist the court at the hearing. Defendant
responded in the affirmative. The court then asked defendant if he believed the pleadings
defendant filed in 2016 and on September 23, 2019, were thorough enough for the trial court to
consider everything at the hearing that day. Defendant again replied in the affirmative. The
court then proceeded with the evidentiary hearing on defendant's claims of ineffective assistance
of trial counsel.

¶ 59 In his opening statement at the hearing, *Krankel* counsel stated the issue at the
evidentiary hearing was whether it was unreasonable for defendant's trial counsel to fail to have
defendant examined by a qualified expert to determine whether he was fit for trial. Counsel

noted it could not be determined at present whether defendant was fit for trial because defense counsel failed to have him examined by a qualified expert. *Krankel* counsel noted section 104-11 of the Code of Criminal Procedure (725 ILCS 5/104-11 (West 2014)) provides that, upon the request of a defendant, a qualified expert may be appointed to examine the defendant if a *bona fide* doubt is raised regarding the defendant's fitness to stand trial. Section 104-13 of the Code of Criminal Procedure (725 ILCS 5/104-13 (West 2014)) defines a qualified expert to be a licensed physician, clinical psychologist, or psychiatrist. *Krankel* counsel argued defendant's trial counsel, who was not a qualified expert, could not make the determination himself.

¶ 60     *Krankel* counsel argued the question at issue was whether there was a *bona fide* doubt of defendant's fitness prior to his trial. *Krankel* counsel called three witnesses to show a *bona fide* doubt existed and trial counsel was ineffective for not asking for a qualified expert to examine defendant to determine if he was unfit for trial.

¶ 61     Deidre Lockhart, defendant's mother, testified defendant was diagnosed with a major depressive disorder, ADHD, and ODD. Defendant's problems started when he was around five years old. His symptoms worsened as he got older. Medication did not solve the issues. Defendant was hospitalized for seven days in June 2007 in the mental health care unit for adolescents at Memorial Medical Center in Springfield. At the hospital, they changed defendant's medication from 54 milligrams of Concerta to 10 milligrams of Adderall. The primary reason for his hospitalization was depression and suicidal ideations. At the hospital, defendant was diagnosed with major depressive disorder and ADHD. His behavior improved while he was in the hospital. Defendant came home after his discharge from the hospital and his behavior was better. Lockhart administered Adderall to him and believed he was taking the medication. However, his behavior started to change around September 2007. He was starting

to fidget again, he was not listening and talking excessively, and he was not able to comprehend what was being said to him.

¶ 62        Defendant was hospitalized in the children's mental health unit again at Memorial Medical Center for five or six days. The hospital personnel gave him the same medication but monitored him to make sure he was taking it. Defendant improved in the hospital when he was taking his medication. During this hospital stay, he was diagnosed with ADHD and ODD. When defendant was discharged, Lockhart tried to assist him with his medicine, but he stopped taking it periodically and his bad behavior returned. Lockhart testified defendant had trouble in school because of his condition. Defendant was not hospitalized again prior to this case.

¶ 63        After defendant was charged in this case, Lockhart's children retained Bruce Locher to represent defendant. She talked with Locher on the phone two or three times and met him in person four times. She talked with Locher four times about defendant's mental health issues and his ability to stand trial. Lockhart asked Locher to have defendant psychiatrically evaluated. She also told Locher about both of defendant's hospitalizations as a child. Lockhart's son, Kenneth Lockhart, was present when she told Locher about defendant's mental health issues. On cross-examination, she said defendant was not present during her meetings with Locher.

¶ 64        Kenneth Lockhart, defendant's brother, testified he was older than defendant and did not live with him on a daily basis as defendant was growing up but was familiar with defendant's behavior as a child. Defendant was immature as a child and was hospitalized in 2007 for suicidal ideations. Before he was hospitalized, defendant would become angry very easily. Kenneth found attorney Locher online and set up an appointment after defendant's arrest. Kenneth and his wife met with Locher and told Locher he would need to look into defendant's

mental health history, which included hospitalization for suicidal ideations. Kenneth testified Locher took notes while Kenneth was telling him about defendant's mental health history. Kenneth testified he met with Locher four times.

¶ 65      Lutece Henderson testified she is Kenneth Lockhart's wife. She also testified she spoke with Locher numerous times about defendant's mental health including when Locher was initially engaged in this case. During their first meeting, Locher asked for additional information from the family about defendant's mental health issues. She met with Locher on multiple occasions and brought up defendant's mental health issues at least three times. On one occasion when defendant's mental health was brought up, Locher reacted almost as if it had never been mentioned before.

¶ 66      The State presented no witnesses but moved to adopt Locher's response dated August 30, 2016. *Krankel* counsel objected to this. The court indicated it heard from Locher at the *Krankel* preliminary inquiry. The court believed Locher's comments at the preliminary inquiry could be considered, but Locher's written comments which were not subject to cross-examination or discussion by the court should not be considered. The State then indicated it would object to any testimony as to defendant's mental health diagnosis because it was hearsay. The court responded it was going to consider defendant's history for what it is and concerns of the family for what they are. According to the court, "Did I hear evidence of a specific mental illness or diagnosis other than some behavioral disorders? That's debatable. But I think I've heard what I need to hear."

¶ 67      At the end of the evidentiary hearing, the trial court stated the issue of a defendant's fitness hinges on his ability to understand the proceedings against him and cooperate with his attorney in his defense. The court noted the fact defendant was hospitalized seven years

earlier has little relevance to whether the people who were around defendant at the time of his trial, including his trial counsel and his jailers, would have believed a *bona fide* doubt existed whether he was fit for trial.

¶ 68          According to the trial court, it had zero evidence defendant was unable to understand what was happening in the proceedings or unable to assist his attorney with his defense. Although defendant had not taken his medication since he was 14, the PSI indicated defendant was a model inmate. The court also noted that, although defendant claimed he was not able to engage in the proceedings and understand the proceedings, he was readily able to identify issues immediately after trial and bring them to everyone's attention. According to the court, "That to me smacks of a second bite at the apple. That to me suggests that we'll sit on this issue, not make an issue until after the trial if I lose." As a result, the court denied defendant's motion.

¶ 69          This appeal followed.

¶ 70                              II. ANALYSIS

¶ 71          Defendant raises a host of issues on appeal. We do not address them in the order he chose to present them. Defendant concedes he forfeited some issues he raises on appeal and asks this court to review them pursuant to the plain-error doctrine. The plain-error doctrine allows a reviewing court to review a forfeited error that is clear and/or obvious when (1) the evidence in a case was so closely balanced that the error alone threatened to tip the scales of justice against the defendant regardless of the seriousness of the error or (2) the error was so serious it affected the fairness of the defendant's trial and challenged the integrity of the judicial process regardless of how close the evidence was in the case. *People v. Sebby*, 2017 IL 119445, ¶¶ 49-51, 89 N.E.3d 675. The defendant bears the burden of persuasion under both prongs of the rule. *People v. Solis*, 2019 IL App (4th) 170084, ¶ 29, 138 N.E.3d 247. The first step under the doctrine is for the

defendant to establish a clear or obvious error occurred. *Sebby*, 2017 IL 119445, ¶ 49.

¶ 72                              A. Right to Present a Defense

¶ 73        Defendant first argues the trial court denied him of his right to present a defense when it precluded him from introducing evidence of Marcus Jackson's prior altercations with defendant and his family and evidence of Marcus's intoxication. Defendant concedes he forfeited these issues because they were not raised in his post-trial motion. However, he asks us to consider the issues pursuant to the plain-error doctrine. We have already laid out the plain-error analysis and do not repeat it here.

¶ 74        Defendant claims he was acting in defense of his brother, Shakil, when he shot Marcus, and this evidence supported his defense. Section 7-1(a) of the Criminal Code of 2012 (720 ILCS 5/7-1(a) (West 2014)) provides:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."

"[A] person defending another stands in the other's shoes and may do whatever the other would be justified in doing to defend himself." *In re W.D.*, 194 Ill. App. 3d 686, 706, 551 N.E.2d 357, 370 (1990).

¶ 75        Throughout his brief, defendant relies heavily on our supreme court's decision in *People v. Lynch*, 104 Ill. 2d 194, 470 N.E.2d 1018 (1984). In *Lynch*, our supreme court found a

victim's violent and aggressive character could support a self-defense claim in two ways. *Lynch*, 104 Ill. 2d at 199–200, 470 N.E.2d at 1020. First, a defendant's knowledge of a victim's violent tendencies would necessarily impact his reaction to and perception of the victim's actions and behavior. *Lynch*, 104 Ill. 2d at 199–200, 470 N.E.2d at 1020. "The same deadly force that would be unreasonable in an altercation with a presumably peaceful citizen may be reasonable in response to similar behavior by a man of known violent and aggressive tendencies." *Lynch*, 104 Ill. 2d at 199-200, 470 N.E.2d at 1020. If the defendant did not know of the victim's character and violent nature, this evidence would be irrelevant to how he responded. *Lynch*, 104 Ill. 2d at 199-200, 470 N.E.2d at 1020. Second, evidence of a victim's violent propensities could support a defendant's version of events if there are conflicting accounts of what happened regardless of whether the defendant knew of the victim's violent tendencies. *Lynch*, 104 Ill. 2d at 199-200, 470 N.E.2d at 1020.

¶ 76    We note defendant mischaracterizes what the trial court did in this case. As the State points out in its appellee's brief, a defendant must introduce evidence supporting his defense pursuant to the normal rules governing the admissibility of the evidence. *People v. Carini*, 357 Ill. App. 3d 103, 118, 827 N.E.2d 1015, 1028 (2005). In this case, the trial court did not preclude or bar defendant from introducing this evidence during the case. In fact, defendant was able to inform the jury he and his family had been experiencing problems in the months leading up to the shooting. During defendant's direct examination, defense counsel asked defendant about the atmosphere when everyone started fighting before the shooting and how defendant felt about it. Defendant testified he felt "riled up," scared, and nervous. He said his "adrenaline was pumping." Defense counsel then asked if defendant had ever been confronted with this type of scenario before and, if so, when. Defendant testified he had "[j]ust a few weeks

before that, a month before that." Defendant also said, "It has been happening all summer." The State did not object to this testimony, but defense counsel failed to ask additional questions about these other incidents.

¶ 77          On cross-examination, defendant was also able to provide the jury with some information as to what had been going on in the months leading up to the shooting. The State asked defendant if he thought Shakil was in danger of being killed at any moment before defendant shot Marcus. When defendant answered in the affirmative, the State asked if that was based on Shakil being severely injured in some way. Defendant answered, "No, it was based upon the fact that we had our lives threatened all summer." The State did not ask to strike this testimony as non-responsive.

¶ 78          The trial court sustained the State's objections to the manner in which defendant was trying to introduce this evidence on redirect examination. "The scope of redirect examination is within the trial court's discretion [citation], and is designed to remove unfavorable inferences raised by cross examination." *People v. Davis*, 92 Ill. App. 3d 426, 428, 416 N.E.2d 69, 71 (1981). Defendant failed to show how the State's cross-examination of him raised any unfavorable inferences about defendant related to prior interactions between Marcus and his family and friends and defendant and his family and friends. Instead, as noted above, defendant was able to inform the jury he and his family had been threatened throughout the summer during his cross-examination. Based on this record, defendant cannot establish the trial court made a clear or obvious error when it would not allow defendant to offer testimony on redirect examination about the alleged prior incidents after the State objected.

¶ 79          We next turn to defendant's argument the trial court erred in not allowing him to present evidence of Marcus's intoxication. According to defendant, the court found this

evidence was not relevant. This argument mischaracterizes the record. The trial court stated the BAC test was not relevant to the stated cause of death by Dr. Patterson, who the State called for purposes of establishing defendant's cause of death. Once again, defendant fails to establish this was a clear or obvious error. The trial court's ruling did not bar defendant from otherwise introducing this evidence.

¶ 80  As a result, the trial court did not deny defendant of his right to present a defense.

¶ 81        B. Ineffective Assistance of Counsel

¶ 82  Defendant argues his trial counsel was ineffective for several reasons, including his alleged failures (1) to introduce evidence of Marcus's prior altercations and threats and his intoxication on the night he was shot, (2) to request a *Lynch* instruction based on the evidence introduced at trial, and (3) to not properly preserve these issues for appeal. To establish ineffective assistance of counsel, a defendant must show his attorney's performance fell below an objective standard of reasonableness. In addition, a defendant must show a reasonable probability exists the outcome of the proceedings would have been different absent his attorney's deficient performance. *Strickland*, 466 U.S. at 687. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Based on the record in this case, defendant cannot establish he was prejudiced by counsel's alleged deficient performance.

¶ 83  With regard to counsel's alleged failure to introduce evidence of Marcus's violent and aggressive character, which defendant calls "*Lynch* evidence," we do not know what that evidence would have been other than Marcus's actions at the birthday party earlier in the evening. We note evidence of Marcus's behavior at the birthday party was introduced during the trial.

¶ 84        Defendant also argues his trial counsel was ineffective for not making an offer of proof with regard to prior incidents showing Marcus being violent and/or aggressive. However, as the State notes, without an offer of proof, the record does not reflect anything about the prior incidents leading up to the shooting that defendant referenced during his testimony, including whether Marcus was even involved in those incidents.

¶ 85        With regard to evidence of Marcus's level of intoxication, defense counsel did make an offer of proof with regard to this evidence. However, defendant offers no real explanation how this evidence would have been any help to him considering Marcus's BAC was only at .06. Marcus also did not have an especially high amount of any other drugs in his system. We do not see how a reasonable probability exists the result of this case would have been different if the jury heard this evidence.

¶ 86        We next move to defendant's claim his trial counsel was ineffective for not asking the trial court to instruct the jury with Illinois Pattern Jury Instructions (Criminal), No. 3.12X (approved October 17, 2014) (hereinafter IPI Criminal No. 3.12X), which he refers to as a *Lynch* jury instruction. Again, we do not know counsel's reason for not asking the court to give this instruction. We do note the Committee Note for the instruction states: "Give this instruction *only* when evidence of the victim's prior conviction for a crime of violence has been admitted pursuant to *People v. Lynch*, 104 Ill.2d 194, 470 N.E.2d 1018 (1984); IRE 405(b)." (Emphasis in original.) The Committee Note also provides the following guidance:

> "The Committee devised this instruction to address the nature of evidence regarding a victim's prior conviction for a crime of violence when the defendant claims self-defense. In *People v. Lynch*, 104 Ill.2d 194, 470 N.E.2d 1018 (1984), the Illinois Supreme Court discussed the situation in which the defendant claimed

to have acted in self-defense, and held that evidence of the victim's prior convictions for crimes of violence was admissible to show the victim's aggressive and violent character."

Defendant does not provide a record citation showing Marcus had a prior conviction for a crime of violence. If Marcus did not have a prior conviction for a crime of violence, defense counsel may have believed the instruction was not appropriate. On appeal, defendant argued a prior conviction for a crime of violence was not necessary to give the instruction. At oral argument, the State agreed.

¶ 87 We need not determine whether defendant is correct and the committee note is wrong. Even assuming, *arguendo,* defense counsel's representation fell below an objective standard of reasonableness because he failed to request this instruction be given, defendant cannot establish he was prejudiced by the deficient performance. A reasonable probability does not exist the result would have been different had the instruction been given to the jury.

¶ 88 Finally, defendant argues his counsel was ineffective for not properly preserving these issues for appellate review. For the reasons already discussed, we fail to see how defense counsel's failure to preserve these issues for appellate review caused defendant any prejudice.

¶ 89                                     C. Second Degree Murder

¶ 90 We next address defendant's argument this court should reduce his first degree murder conviction to a second degree murder conviction "because he proved, by a preponderance of the evidence, that he had an actual, albeit unreasonable, belief in the need to defend his brother against the decedent's physical attack." In *People v. Blackwell*, 171 Ill. 2d 338, 357-58, 665 N.E.2d 782, 790 (1996), our supreme court stated that when a defendant is arguing he presented sufficient evidence to prove a mitigating factor by a preponderance of the

evidence so that he should have been convicted of second degree murder instead of first degree murder, a reviewing court should consider whether any rational trier of fact could have determined the mitigating factor was not present after viewing the evidence in the light most favorable to the prosecution.

¶ 91 Section 9-2(a)(2) of the Criminal Code of 2012 (720 ILCS 5/9-2(a)(2) (West 2014)) states:

> "(a) A person commits the offense of second degree murder when he or she commits the offense of first degree murder as defined in paragraph (1) or (2) of subsection (a) of Section 9-1 of this Code and either of the following mitigating factors are present:
>
> ***
>
> (2) at the time of the killing he or she believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his or her belief is unreasonable."

To find a defendant guilty of second degree murder, the trier of fact has to find the defendant subjectively believed the circumstances justified his actions.

¶ 92 The trier of fact in this case was in a better position than this court to judge the credibility of the witnesses. *People v. Jackson,* 2020 IL 124112, ¶ 69, 162 N.E.3d 223. Unlike this court, the jury in this case was able to watch defendant testify and judge his credibility. The jury apparently did not find defendant believed his act of shooting Marcus was justified, and a rational trier of fact could have made this determination.

¶ 93 Defendant was in close proximity to Shakil and Marcus when they were fighting.

Shakil did not have any serious injuries a few hours after the fight occurred. After the shooting, defendant ran from the scene and never turned himself into the police. Instead, defendant went to St. Louis, where he stayed until he was found by the United States Marshal Service 52 days after the shooting. Finally, defendant claimed he did not know what happened to the gun he used to shoot Marcus. This evidence does not support a claim defendant believed he was justified in shooting Marcus.

¶ 94                                      D. Jury Instruction

¶ 95            We next address defendant's argument the trial court erred by refusing to allow the jury to be instructed on second degree murder based on serious provocation. Our supreme court has stated:

> "A person commits second degree murder when he or she commits first degree murder and either of two mitigating factors exists. The first factor involves an unreasonable belief in self-defense. *** The second mitigating factor is that at the time of the killing, the offender was acting under a 'sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he or she negligently or accidentally causes the death of the individual killed.' 720 ILCS 5/9-2(a)(1) (West 2014). The statute defines '[s]erious provocation' as 'conduct sufficient to excite an intense passion in a reasonable person.' 720 ILCS 5/9-2(b) (West 2014). The only categories recognized by this court to constitute serious provocation are substantial physical injury or substantial physical assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse. [Citation.] Mutual combat is a fight or struggle that both parties enter willingly or where two

persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat." *People v. McDonald*, 2016 IL 118882, ¶ 59, 77 N.E.3d 26, 41-42.

Quoting *People v. Calhoun*, 404 Ill. App. 3d 362, 387, 935 N.E.2d 663, 684 (2010), defendant argues Illinois courts recognize "[s]erious provocation arising from substantial physical injury or assault extends to injuries to family members, including children."

¶ 96        Defendant's trial counsel argued for the instruction because defendant allegedly was acting under a sudden and intense passion, which resulted from Marcus coming to his house to fight over what happened at the bar earlier in the evening. However, trial counsel did not provide the trial court with any authority to support his request for the instruction. The State objected, arguing the instruction should not be given because defendant did not testify he was inflamed and passionate beyond reproach. Further, the State noted defendant argued he fired the gun to protect his brother and did not object to the jury being given a second degree murder instruction based on an unreasonable belief in self-defense.

¶ 97        Defendant compares his situation in this case to the facts in *People v. Rice*, 351 Ill. 604, 184 N.E. 894 (1933), and *People v. Johnson*, 4 Ill. App. 3d 249, 250-53, 280 N.E.2d 764 (1972). The State argues *Rice* is inapposite, and we agree. Our supreme court in *Rice* was considering defendant's argument his conviction for manslaughter should be reversed. *Rice*, 351 Ill. at 609, 184 N.E. at 896.

¶ 98        As for *Johnson*, the defendant in that case was returning home from a dance around 11:30 p.m. An argument and then a fight ensued between the defendant, the defendant's friend, and George Shaw. During the fight, defendant stabbed Shaw, which led to his death. *Johnson*, 4 Ill. App. 3d at 250, 280 N.E.2d at 765-66. Defendant was found guilty of murder

after a bench trial. *Johnson*, 4 Ill. App. 3d at 250, 280 N.E.2d at 765.

¶ 99 The First District noted the State's evidence showed the defendant stabbed the victim in the leg after the victim had attacked the defendant and his friend. The defense presented evidence defendant went to defend his friend who had been struck by the victim. A fight then started between defendant and the victim. During the fight, defendant stabbed the victim in the leg and escaped. The victim was larger than defendant and had a reputation of being a skillful and aggressive fighter. *Johnson*, 4 Ill. App. 3d at 250, 280 N.E.2d at 766. The First District stated "[t]he law in Illinois is well settled that mutual quarrel or combat is sufficient to support a finding of serious provocation." *Johnson*, 4 Ill. App. 3d at 252, 280 N.E.2d at 766. The First District ruled, "As the provocation which aroused the passion of the defendant was sufficient in law and in fact to come within the definition of serious provocation as contemplated by the Manslaughter Statute, the conviction will be reduced from murder to voluntary manslaughter." *Johnson*, 4 Ill. App. 3d at 252, 280 N.E.2d at 767.

¶ 100 The First District later indicated its opinion in *Johnson* failed to address the issue of whether grossly disproportionate retaliation could negate the mutual combat aspect of provocation. See *People v. Thompson*, 354 Ill. App. 3d 579, 590, 821 N.E.2d 664, 673 (2004). In *People v. Lauderdale*, 2012 IL App (1st) 100939, ¶ 26, 967 N.E.2d 939, the First District held there is no mutual combat when the accused retaliates in a manner that is out of proportion to the provocation, especially in murders committed with a deadly weapon.

¶ 101 Our supreme court has held "that when the trial court, after reviewing all the evidence, determines that there is insufficient evidence to justify the giving of a jury instruction, the proper standard of review of that decision is abuse of discretion." *McDonald*, 2016 IL 118882, ¶ 42. In this case, the trial court did not abuse its discretion in determining sufficient

evidence did not exist to give this instruction.

¶ 102        Here, defendant was not reacting to either himself or his brother suffering any substantial physical injury or substantial physical assault, defendant was not subject to an illegal arrest, and defendant's actions were not a reaction to adultery. While defendant's brother and Marcus were involved in mutual combat, defendant was not a part of that mutual combat. Further, the two men were having a fist fight without weapons. Even assuming, *arguendo*, defendant was part of the mutual combat, his act of shooting Marcus could not be justified because it was completely and totally out of proportion to the fist fight taking place between Shakil and Marcus.

¶ 103                          E. State's Closing Argument

¶ 104        Defendant next argues the cumulative effect of improper comments made by the State during its closing argument denied defendant his right to a fair trial. According to defendant, the State both misstated the law and made comments to inflame the jury. Defendant concedes he forfeited this issue because his counsel did not object during the State's closing argument. However, defendant asks this court to review this issue pursuant to the plain-error doctrine.

¶ 105        Generally, prosecutors are given wide latitude in making closing arguments. *Jackson*, 2020 IL 124112, ¶ 82. This includes making comments on evidence and any fair and reasonable inference the evidence may yield. *Jackson*, 2020 IL 124112, ¶ 82. This also includes making inferences that reflect negatively on the defendant. *Jackson*, 2020 IL 124112, ¶ 82. Courts of review look at the State's argument as a whole instead of focusing on specific remarks. *Jackson*, 2020 IL 124112, ¶ 82.

¶ 106        "The standard of review applied to a prosecutor's closing argument is similar to

the standard used in deciding whether a prosecutor committed plain error." *Jackson*, 2020 IL 124112, ¶ 83. Our supreme court indicated it would only find reversible error "if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error." *Jackson*, 2020 IL 124112, ¶ 83.

¶ 107    Many of defendant's complaints about the State's closing argument are taken out of context. Defendant points to the State saying defendant brought himself to this fight. However, defendant ignores the fact the State made clear to the jury it was Marcus and his brothers who went to Fayette and Douglas looking for a fight with Shakil.

¶ 108    Defendant also complains the State improperly argued defendant did not meet his burden with regard to second degree murder because defendant failed to call his brother as a witness. However, the State argued defendant's testimony, which was the only direct evidence of what defendant believed for purposes of self-defense, was not credible as shown by his actions after the shooting. Defendant points to no other evidence which is favorable to defendant of what he was thinking when he shot Marcus. On the other hand, the State had circumstantial evidence defendant did not believe he was justified in shooting Marcus. By pointing out Shakil did not testify, it appears the State was simply suggesting even defendant's brother's testimony would not have been helpful to defendant.

¶ 109    In addition, defendant argues the State erred by saying defendant waited for his chance to shoot Marcus from behind, implying this was a premeditated crime. Once again, defendant is taking the State's comment out of context. The State was commenting that the evidence showed even Shakil had agreed to have a fight without weapons and defendant was not participating in the fight at all. Instead, defendant was simply watching what was happening until he decided to shoot Marcus three times from behind while Marcus was having a fist fight

with Shakil.

¶ 110　　Defendant also contends the State erred by arguing defendant's testimony did not establish he was justified in shooting Marcus because he did not testify Shakil was in trouble and defendant absolutely needed to save him. Further, defendant argues the State erred by arguing defendant had to show Shakil was in mortal danger to prove he believed he was justified in shooting Marcus. Again, defendant misstates the prosecution's argument. The State did not argue defendant had to produce specific evidence to establish he believed he was justified in shooting Marcus. The State was simply (1) providing examples of evidence defendant could have introduced to show why he believed he was justified in shooting Marcus and then (2) arguing how defendant did not do so.

¶ 111　　Defendant also asserts the State made several comments which served no purpose other than to inflame the passion of the jurors. Defendant points to the State saying: "What do you do when you have a guilty client? This is what you do. You put a tie on him. You put a shirt on him so he looks a little better than coming in in a jail uniform. We fly no false colors. There's smoke and mirrors. We give you the truth." Defendant also points to the State's argument in rebuttal to defendant's closing argument that defendant's defense and defense counsel's closing argument were "insulting" and "offensive."

¶ 112　　Based on the context of the State's argument, we suspect the State was responding to defense counsel's argument regarding some of the State's witnesses being convicted felons when it commented on defendant's attire.

> "[Defense counsel] wants to talk about how our witnesses are felons.
> Some of the witness[es] [have] been convicted of felonies, and you can actually—
> you can absolutely take that into consideration in judging their testimony. That is

- 40 -

the law.

I think there's no doubt that their testimony was true. All the physical evidence backs up what they say. The Defendant backs up what they say. Some of our witnesses were in jail. We brought them in in shackles and their jail uniforms. The Defendant, who testified, he's currently in jail. What do you do when you have a guilty client? This is what you do. You put a tie on him. You put a shirt on him so he looks a little better coming in in a jail uniform. We fly no false colors. There's smoke and mirrors. We give you the truth."

While a defendant cannot complain of rebuttal argument when defense counsel provoked the State's response (*People v. Evans*, 209 Ill. 2d 194, 225, 808 N.E.2d 939, 956 (2004)), the State conceded at oral argument the prosecutor's comments about dressing the defendant up for trial was not a proper argument. We agree. However, the State's comment was not "so prejudicial that real justice was denied or the verdict resulted from the error." *Jackson*, 2020 IL 124112, ¶ 83. Further, even if we also agreed the State pushed the boundaries of argument too far by referring to the defense theory of the case and closing argument as "insulting" and "offensive," defendant cannot demonstrate these remarks combined with the improper remarks about defendant's clothing were "so prejudicial that real justice was denied or the verdict resulted from the error" (*Jackson*, 2020 IL 124112, ¶ 83).

¶ 113                                    F. Sentence

¶ 114                      1. *As Applied Disproportionate Sentence Challenge*

¶ 115          Defendant was 19 years old when he killed Marcus in this case. In a series of cases involving juvenile sentencing, the United States Supreme Court has held the eighth amendment to the federal constitution prohibits defendants who commit crimes while a juvenile

from receiving a death sentence (*Roper v. Simmons*, 543 U.S. 551, 578-79 (2005)), mandatory life sentences without the possibility of parole for nonhomicide offenses (*Graham v. Florida*, 560 U.S. 48, 82 (2010)), and mandatory life sentences without the possibility of parole for homicide (*Miller v. Alabama*, 567 U.S. 460, 489 (2012)). The Supreme Court held "children are constitutionally different from adults for purposes of sentencing." *Miller*, 567 U.S. at 471. Recently, the Supreme Court clarified *Miller*'s holding only necessitated a "discretionary sentencing procedure" and not any formal factual findings. *Jones v. Mississippi*, 593 U.S. ___, ____, 141 S. Ct. 1307, 1317-18 (2021).

¶ 116       In *People v. Reyes*, 2016 IL 119271, ¶¶ 9-10, 63 N.E.3d 889, our supreme court found *Miller* applied to a mandatory term of years sentence that was the functional equivalent of life without the possibility of parole—a *de facto* life sentence. Subsequently, in *People v. Holman*, 2017 IL 120655, ¶ 40, 91 N.E.3d 849, the court held *Miller* applied to discretionary life sentences without the possibility of parole for crimes committed by a juvenile, although the court later found that holding questionable. See *People v. Dorsey*, 2021 IL 123010, ¶ 41, 183 N.E.3d 715. In *People v. Buffer*, 2019 IL 122327, ¶ 40, 137 N.E.3d 763, our supreme court found a sentence of more than 40 years for a crime committed by a juvenile constitutes a *de facto* life sentence.

¶ 117       In his brief, defendant argues our supreme court's recent decision in *People v. House*, 2021 IL 125124, ¶ 22, 185 N.E.3d 1234, "reaffirmed the legal viability of as-applied sentencing challenges brought by so-called 'emerging adults.' " According to defendant, his 50-year sentence is a *de facto* life sentence, which by virtue of *Miller* and its progeny, including *House*, violates the Illinois proportionate penalties clause (Ill. Const. 1970, art. I, § 11). Defendant asks this court to entertain his as-applied proportionate penalties challenge to his

sentence in this appeal.  We decline to do so.

¶ 118        We note the defendant in *House* was sentenced to a mandatory natural life sentence.  We further note the holding in *Buffer* pertained to sentences exceeding 40 years imposed upon juveniles, not adults.  Regardless, assuming *arguendo* defendant's 50-year sentence is a *de facto* life sentence, we are mindful of what our supreme court stated in *People v. Harris*, 2018 IL 121932, ¶ 39, 120 N.E.3d 900:

> " ' " 'A court is not capable of making an "as applied" determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact.  [Citation.]  Without an evidentiary record, any finding that a statute is unconstitutional "as applied" is premature.' " ' "  *Harris*, 2018 IL 121932, ¶ 39 (quoting *People v. Rizzo*, 2016 IL 118599, ¶ 26, 61 N.E.3d 92; quoting *People v. Mosley*, 2015 IL 115872, ¶ 47, 33 N.E.3d 137; quoting *In re Parentage of John M.*, 212 Ill. 2d 253, 268, 817 N.E.2d 500 (2004)).

According to defendant's brief, the record in this case establishes the statutes permitting his 50-year sentence were disproportionate as applied to him because of his difficult childhood, mental health issues, and the circumstances of the shooting.

¶ 119        With regard to the development of a record, we disagree with defendant. Defendant failed to raise this argument in his motion to reconsider sentence, no evidentiary hearing has been held on this claim, and a trial court has not made any findings of fact with regard to defendant's specific circumstances.  As a result, we will not consider this argument on this issue in this appeal.

### 2. *Excessive Sentence*

¶ 120        Defendant next argues his 50-year sentence is excessive.  Defendant did raise this

issue in his motion to reconsider sentence. "A reviewing court may not alter a defendant's sentence absent an abuse of discretion by the trial court." *People v. Alexander*, 239 Ill. 2d 205, 212, 940 N.E.2d 1062, 1066 (2010). A court abuses its discretion where the sentence imposed is " 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Alexander*, 239 Ill. 2d at 212, 940 N.E.2d at 1066 (quoting *People v. Stacey*, 193 Ill. 2d 203, 210, 737 N.E.2d 626, 629 (2000)). The trial court at the sentencing hearing indicated it had considered the fact defendant shot the victim multiple times, fled the scene, and "absconded from the community." The court also indicated it had carefully considered all the evidence received, the jury's verdict, the PSI, the comments and arguments of the parties, defendant's statement, the testimony presented at the sentencing hearing, and the relevant factors in aggravation and mitigation. The court also indicated it had taken note of defendant's young age and the other circumstances involved in this situation, defendant's criminal history, and the nature of the offense.

¶ 121    Based on its analysis, the sentencing court determined this was not a case where it could impose the minimum sentence. However, the sentence it imposed was only 5 years more than the statutory minimum. Considering the facts in this case, the trial court did not abuse its discretion in sentencing defendant.

¶ 122                    G. Effectiveness of *Krankel* Counsel

¶ 123    Defendant next argues his *Krankel* counsel was ineffective. When counsel is appointed to represent a defendant after a preliminary inquiry pursuant to *Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984), the defendant is entitled to constitutionally effective assistance of counsel because a posttrial motion is a critical part of a criminal proceeding. *People v. Downs*, 2017 IL App (2d) 121156-C, ¶ 41, 83 N.E.3d 584.

¶ 124      As previously stated, to establish ineffective assistance of counsel, a defendant must show his attorney's performance fell below an objective standard of reasonableness.  In addition, a defendant must show a reasonable probability exists the outcome of the proceedings would have been different absent his attorney's deficient performance.  *Strickland*, 466 U.S. at 687.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.

¶ 125      The Second District in *Downs*, 2017 IL App (2d) 121156-C, ¶¶ 48-51, has provided guidance regarding the obligations of *Krankel* counsel.  Justice Birkett wrote:

> "The obligation to represent the defendant requires *Krankel* counsel to independently evaluate the defendant's *pro se* allegations of ineffective assistance of trial counsel and present those with merit to the trial court during the second-stage adversarial hearing. What, then, should be the criteria to determine merit? In our view, the criteria flow from the obligation not to present a frivolous pleading.
>
> A frivolous claim is one with no arguable basis in law or in fact. [Citation.]  Conversely, a nonfrivolous claim will have at least an arguable basis in law or in fact, although it might turn out to be unsuccessful. [Citation.]  In spite of the uncertainty, counsel's obligation to represent the defendant requires him or her to present any nonfrivolous claim to the trial court even where there remains a possibility or even likelihood that the defendant will not prevail on the claim. To place this into the context of a *Krankel* inquiry, *Krankel* counsel must sift through the defendant's *pro se* allegations to determine if any are nonfrivolous and then must present those nonfrivolous claims to the trial court during the second-stage adversarial hearing.  *Downs*, 2017 IL App (2d) 121156-C, ¶¶ 49-50.

However, under *Strickland*, 466 U.S. at 687, *Krankel* counsel would not be constitutionally ineffective for not presenting a nonfrivolous claim unless the defendant could show a reasonable probability exists the outcome of the proceedings would have been different absent *Krankel* counsel's deficient performance. Based on this record, we have no way of knowing the extent *Krankel* counsel investigated defendant's *pro se* claims of ineffective assistance of trial counsel to determine if they were frivolous or had an arguable basis in law or in fact. Further, defendant has failed to show he was prejudiced by *Krankel* counsel's performance.

¶ 126    Defendant first argues his *Krankel* counsel should have argued defendant's trial counsel was ineffective for failing to call Shakil and Laprice as witnesses. However, based on Shakil and Laprice's affidavits, their testimony would have been no help to defendant in establishing he believed he was justified in shooting Marcus three times from behind. If anything, Shakil's testimony—if it was consistent with his "affidavit"—would have hurt defendant's case. According to Shakil's affidavit, he was handling Marcus quite easily during the brawl and did not tell defendant to shoot Marcus. Further, Laprice's "affidavit" provided nothing that helped establish defendant believed he was justified in shooting Marcus. As for defendant's sentence, defendant fails to offer any real explanation how he was prejudiced by *Krankel* counsel's failure to argue defendant's trial counsel was ineffective for not challenging defendant's sentence based on the proportionate penalties clause.

¶ 127    Defendant also argues *Krankel* counsel was ineffective in the way he pursued defendant's claim his trial counsel was ineffective for not asking for a fitness evaluation for defendant before his trial. According to defendant's brief:

> "Specifically, *Krankel* counsel argued that trial counsel should have had
> [defendant] evaluated by a qualified expert in order to determine his fitness to

stand trial. [Citation.] In support of that claim, *Krankel* counsel presented three family members to testify that [defendant] had ADHD and ODD, was hospitalized twice for major depression and suicidal ideations as a child, and that trial counsel was repeatedly asked to investigate [defendant's] mental health issues. [Citation.] At no point did *Krankel* counsel actually have [defendant] evaluated by a qualified expert, nor did counsel corroborate any of the witness[es'] testimony with medical records."

Defendant also argued in his brief that "if *Krankel* counsel truly believed that trial counsel should have had a *bona fide* doubt as to [defendant's] fitness to stand trial, then the appropriate course of action, consistent with his obligation to independently investigate a *pro se Krankel* claim, would be to request that the circuit court order an evaluation of [defendant] prior to the evidentiary hearing." According to defendant's brief, "[a]s in *Downs*, *Krankel* counsel raised a claim that was frivolous absent any fitness evaluation of [defendant] by a qualified professional, and abandoned [defendant's] nonfrivolous claims."

¶ 128      We first note we see no reason why *Krankel* counsel would have had defendant evaluated before the post-trial evidentiary hearing in November 2021 as defendant suggests to establish defendant was unfit for trial in July 2016. Defendant also provides no explanation why *Krankel* counsel should have had a *bona fide* doubt of defendant's fitness in 2021. He also gives no indication what medical records *Krankel* counsel should have used to bolster his claim.

¶ 129      We do not know why *Krankel* counsel chose to focus on defendant's allegation his trial attorney was ineffective for not asking for a fitness evaluation on defendant prior to his trial. However, it may be that *Krankel* counsel made a strategic decision to focus on this issue because he saw it as a possible way to get defendant a new trial irrespective of the State's strong

evidence defendant could not have believed he was justified in shooting Marcus. Regardless, as we stated earlier, defendant has failed to show how he was prejudiced by his *Krankel* counsel's representation, and we address this issue no further.

¶ 130                                    III. CONCLUSION

¶ 131          For the reasons stated, we affirm the trial court's judgment.

¶ 132          Affirmed.